1
2
3
4
5
6
7
8

*Law Offices of*
**BONNETT, FAIRBOURN, FRIEDMAN**
**& BALINT, P.C.**
*2325 East Camelback Road, Suite 300*
*Phoenix, Arizona 85016-3422*
*(602) 274-1100*
*Elaine A. Ryan (AZ 012870)*
*eryan@bffb.com*
*Van Bunch (AZ 009630)*
*vbunch@bffb.com*
*Eric D. Zard (AZ 027431)*
*ezard@bffb.com*

*Attorneys for Plaintiffs*

9

**UNITED STATES DISTRICT COURT**

10

**DISTRICT OF ARIZONA**

| | |
|---|---|
| 11<br>12<br>13<br>14<br>15<br>16 | LEGENDS COLLISION, LLC, RAINTREE AUTO BODY, INC., JAN'S EUROPEAN AUTO BODY d/b/a JAN'S SPECTRUM COLLISION CENTER, ROBERT K. ISHAM f/k/a NEW IMAGE PAINT AND BODY SHOP, INC., AIRPORT ENTERPRISES, INC., d/b/a AIRPORT AUTO CENTER, and ORLANDO AUTO BODY, INC.,<br><br>Plaintiffs,<br><br>vs. |

Case No.

**COMPLAINT**

17
18
19
20
21
22
23
24
25
26

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, STATE FARM FIRE
AND CASUALTY COMPANY, FARMERS
INSURANCE COMPANY OF ARIZONA,
FARMERS INSURANCE EXCHANGE,
ZURICH AMERICAN INSURANCE
COMPANY, PROGRESSIVE PREFERRED
INSURANCE COMPANY, PROGRESSIVE
ADVANCED INSURANCE COMPANY,
PROGRESSIVE CASUALTY INSURANCE
COMPANY, GEICO CASUALTY COMPANY,
GEICO GENERAL INSURANCE COMPANY,
GEICO INDEMNITY COMPANY,
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, ALLSTATE FIRE AND
CASUALTY INSURANCE COMPANY,
ALLSTATE INDEMNITY COMPANY,
ALLSTATE INSURANCE COMPANY,
ALLSTATE PROPERTY AND CASUALTY
INSURANCE COMPANY, UNITED SERVICES

1  AUTOMOBILE ASSOCIATION, USAA
   CASUALTY INSURANCE COMPANY, USAA
2  GENERAL INDEMNITY COMPANY,
   AMERICAN FAMILY MUTUAL INSURANCE
3  COMPANY, LIBERTY MUTUAL INSURANCE
   COMPANY, SAFECO INSURANCE
4  COMPANY OF AMERICA, HARTFORD
   CASUALTY INSURANCE COMPANY,
5  HARTFORD INSURANCE COMPANY OF THE
   MIDWEST, CSAA FIRE & CASUALTY
6  INSURANCE COMPANY, NATIONWIDE
   INSURANCE COMPANY OF AMERICA,
7  NATIONWIDE MUTUAL INSURANCE
   COMPANY, NATIONWIDE AFFINITY
8  INSURANCE COMPANY OF AMERICA,
   SENTRY INSURANCE A MUTUAL
9  COMPANY, METROPOLITAN CASUALTY
   INSURANCE COMPANY, METROPOLITAN
10 GROUP PROPERTY AND CASUALTY
   INSURANCE COMPANY, METROPOLITAN
11 PROPERTY AND CASUALTY INSURANCE
   COMPANY, INFINITY INSURANCE
12 COMPANY, TRAVELERS PROPERTY
   CASUALTY COMPANY, TRAVELERS
13 CASUALTY AND SURETY COMPANY OF
   AMERICA, TRAVELERS CASUALTY
14 INSURANCE COMPANY OF AMERICA, THE
   TRAVELERS INDEMNITY COMPANY,
15 SAFEWAY INSURANCE COMPANY,
   COUNTRY MUTUAL INSURANCE
16 COMPANY, UNITED AUTOMOBILE
   INSURANCE COMPANY,
17
                              Defendants.
18

19      Plaintiffs Legends Collision, LLC, Raintree Auto Body, Inc., Jan's European Auto

20 Body, Inc., and Robert K. Isham, Airport Enterprises Inc., Orlando Auto Body, Inc.

21 (collectively, "Plaintiffs"), by and through undersigned counsel, for its Complaint against

22 defendants State Farm Mutual Automobile Insurance Company, State Farm Fire And

23 Casualty Company, Farmers Insurance Company Of Arizona, Farmers Insurance Exchange,

24 Zurich American Insurance Company, Progressive Preferred Insurance Company,

25 Progressive Advanced Insurance Company, Progressive Casualty Insurance Company,

26 Geico Casualty Company, Geico General Insurance Company, Geico Indemnity Company,

Government Employees Insurance Company, Allstate Fire And Casualty Insurance Company, Allstate Indemnity Company, Allstate Insurance Company, Allstate Property And Casualty Insurance Company, United Services Automobile Association, USAA Casualty Insurance Company, USAA General Indemnity Company, American Family Mutual Insurance Company, Liberty Mutual Insurance Company, Safeco Insurance Company Of America, Hartford Casualty Insurance Company, Hartford Insurance Company Of The Midwest, CSAA Fire & Casualty Insurance Company, Nationwide Insurance Company Of America, Nationwide Mutual Insurance Company, Nationwide Affinity Insurance Company Of America, Sentry Insurance A Mutual Company, Metropolitan Casualty Insurance Company, Metropolitan Group Property And Casualty Insurance Company, Metropolitan Property And Casualty Insurance Company, Infinity Insurance Company, Travelers Property Casualty Company, Travelers Casualty And Surety Company Of America, Travelers Casualty Insurance Company Of America, The Travelers Indemnity Company, Safeway Insurance Company, Country Mutual Insurance Company, United Automobile Insurance Com (collectively, "Defendants"), hereby complain and allege as follows:

**PARTIES**

1.      Plaintiff Legends Collision, LLC, is an Arizona limited liability corporation with its principle place of business in Mesa, Arizona and is authorized to transact auto collision business in the State of Arizona.

2.      Plaintiff Raintree Auto Body, Inc., is an Arizona corporation with its principle place of business in Scottsdale, Arizona and is authorized to transact business in the State of Arizona.

3.      Plaintiff Jan's European Auto Body, Inc. (d/b/a Jan's Spectrum Collision Center) is an Arizona corporation with its principle place of business in Tempe, Arizona and is authorized to transact auto collision business in the State of Arizona.

4.      Plaintiff Robert K. Isham is the former owner of New Image Paint & Body Shop, Inc. (f/k/a New Image Paint and Body Shop, Inc.), which was sold on December 31, 2012. Prior to December 31, 2012, New Image Paint & Body Shop, Inc.'s principle place of business was in Tempe, Arizona and was authorized to transact auto collision business in the State of Arizona. New Image Paint & Body Shop, Inc. continues to transact auto collision business in the State of Arizona and maintains the same principle place of business in Tempe, Arizona; however, Plaintiff Isham seeks damages as a result of Insurer Defendants' misconduct prior to December 31, 2012.

5.      Plaintiff Airport Enterprises, Inc. (d/b/a Airport Auto Center) is an Arizona corporation with its principle place of business in Phoenix, Arizona and is authorized to transact auto collision business in the State of Arizona.

6.      Plaintiff Orlando Auto Body, Inc. is an Arizona corporation with its principle place of business in Mesa, Arizona and is authorized to transact auto collision business in the State of Arizona.

7.      Defendant State Farm Mutual Automobile Insurance Company is an Illinois insurance company with its principle place of business in Bloomington, IL. Defendant State Farm Mutual Automobile Insurance Company is registered with the Arizoc/ona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant State Farm Mutual Automobile Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

8.      Defendant State Farm Fire and Casualty Company is an Illinois insurance company with its principle place of business in Bloomington, IL. Defendant State Farm Fire and Casualty Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant State Farm Fire and Casualty Company may be served with process

through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

9.      Defendant Farmers Insurance Company of Arizona is an Arizona insurance company with its principle place of business in Phoenix, AZ. Defendant Farmers Insurance of Arizona is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Defendant Farmers Insurance Company of Arizona may be served with process through its statutory agent, Corporation Services Company, 2338 West Royal Palm Road, Suite J, Phoenix, Arizona 85021.

10.      Defendant Farmers Insurance Exchange is a California insurance company with its principle place of business in Los Angeles, CA. Defendant Farmers Insurance Exchange is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Farmers Insurance Exchange may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

11.      Defendant Zurich American Insurance Company is a New York insurance company with its principle place of business in Schaumburg, IL. Defendant Zurich American Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Zurich American Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

12.      Defendant Progressive Preferred Insurance Company is an Ohio insurance company with its principle place of business in Mayfield Village, OH. Defendant Progressive Preferred Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona.

Pursuant to A.R.S. § 20-222(A), Defendant Progressive Preferred Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

13.     Defendant Progressive Advanced Insurance Company is an Ohio insurance company with its principle place of business in Cleveland, OH. Defendant Progressive Advanced Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant  Progressive Advanced Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

14.     Defendant Progressive Casualty Insurance Company is an Ohio insurance company with its principle place of business in Cleveland, OH. Defendant Progressive Casualty Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Progressive Casualty Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

15.     Defendant GEICO Casualty Company is a Maryland insurance company with its principle place of business in Chevy Chase, MD. Defendant GEICO Casualty Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant GEICO Casualty Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

16.     Defendant GEICO General Insurance Company is a Maryland insurance company with its principle place of business in Chevy Chase, MD. Defendant GEICO General Insurance Company is registered with the Arizona Department of Insurance and is

licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant GEICO General Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

17.     Defendant GEICO Indemnity Company is a Maryland insurance company with its principle place of business in Chevy Chase, MD. Defendant GEICO Indemnity Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant GEICO Indemnity Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

18.     Defendant Government Employees Insurance Company is a Maryland insurance company with its principle place of business in Chevy Chase, MD. Defendant Government Employees Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Government Employees Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

19.     Defendant Allstate Fire and Casualty Insurance Company is an Illinois insurance company with its principle place of business in Northbrook, IL. Defendant Allstate Fire and Casualty Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Allstate Fire and Casualty Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

20.     Defendant Allstate Indemnity Company is an Illinois insurance company with its principle place of business in Northbrook, IL. Defendant Allstate Indemnity Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Allstate Indemnity Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

21.     Defendant Allstate Insurance Company is an Illinois insurance company with its principle place of business in Northbrook, IL. Defendant Allstate Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Allstate Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

22.     Defendant Allstate Property and Casualty Insurance Company is an Illinois insurance company with its principle place of business in Northbrook, IL. Defendant Allstate Property and Casualty Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Allstate Property and Casualty Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

23.     Defendant United Services Automobile Association is a Texas insurance company with its principle place of business in San Antonio, TX. Defendant United Services Automobile Association is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant United Services Automobile Association may be served

with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

24. Defendant USAA Casualty Insurance Company is a Texas insurance company with its principle place of business in San Antonio, TX. Defendant USAA Casualty Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant USAA Casualty Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

25. Defendant USAA General Indemnity Company is a Texas insurance company with its principle place of business in San Antonio, TX. Defendant USAA General Indemnity Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant USAA General Indemnity Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

26. Defendant American Family Mutual Insurance Company is a Wisconsin insurance company with its principle place of business in Madison, WI. Defendant American Family Mutual Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant American Family Mutual Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

27. Defendant Liberty Mutual Insurance Company is a Massachusetts insurance company with its principle place of business in Boston, MA. Defendant Liberty Mutual Insurance Company is registered with the Arizona Department of Insurance and is licensed

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Liberty Mutual Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

28.     Defendant Safeco Insurance Company of America is a New Hampshire insurance company with its principle place of business in Boston, MA. Defendant Safeco Insurance Company of America is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Safeco Insurance Company of America may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

29.     Defendant Hartford Casualty Insurance Company is an Indiana insurance company with its principle place of business in Hartford, CT. Defendant Hartford Casualty Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Hartford Casualty Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

30.     Defendant Hartford Insurance Company of the Midwest is an Indiana insurance company with its principle place of business in Hartford, CT. Defendant Hartford Insurance Company of the Midwest is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Hartford Insurance Company of the Midwest may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

31.     Defendant CSAA Fire & Casualty Insurance Company is an Indiana insurance company with its principle place of business in Walnut Creek, CA. Defendant CSAA Fire & Casualty Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant CSAA Fire & Casualty Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

32.     Defendant Nationwide Insurance Company of America is a Wisconsin insurance company with its principle place of business in Columbus, OH. Defendant Nationwide Insurance Company of America is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Nationwide Insurance Company of America may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

33.     Defendant Nationwide Mutual Insurance Company is an Ohio insurance company with its principle place of business in Columbus, OH. Defendant Nationwide Mutual Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Nationwide Mutual Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

34.     Defendant Nationwide Affinity Insurance Company of America is an Ohio insurance company with its principle place of business in Columbus, OH. Defendant Nationwide Affinity Insurance Company of America is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Nationwide Affinity Insurance

Company of America may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

35.    Defendant Sentry Insurance Mutual Company is a Wisconsin insurance company with its principle place of business in Stevens Point, WI. Defendant Sentry Insurance a Mutual Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Sentry Insurance a Mutual Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

36.    Defendant Metropolitan Casualty Insurance Company is a Rhode Island insurance company with its principle place of business in Warwick, RI. Defendant Metropolitan Casualty Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Metropolitan Casualty Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

37.    Defendant Metropolitan Group Property and Casualty Insurance Company is a Rhode Island insurance company with its principle place of business in Warwick, RI. Defendant Metropolitan Group Property and Casualty Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Metropolitan Group Property and Casualty Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

38.    Defendant Metropolitan Property and Casualty Insurance Company is a Rhode Island insurance company with its principle place of business in Warwick, RI.

Defendant Metropolitan Property and Casualty Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Metropolitan Property and Casualty Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

39.    Defendant Infinity Insurance Company is an Indiana insurance company with its principle place of business in Birmingham, AL. Defendant Infinity Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Infinity Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

40.    Defendant Travelers Property Casualty Company of America is a Connecticut insurance company with its principle place of business in Hartford, CT. Defendant Travelers Property Casualty Company of America is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Travelers Property Casualty Company of America may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

41.    Defendant Travelers Casualty and Surety Company of America is a Connecticut insurance company with its principle place of business in Hartford, CT. Defendant Travelers Casualty and Surety Company of America is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Travelers Casualty and Surety Company of America may be served with process through the Director of the

Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

42.     Defendant Travelers Casualty Insurance Company of America is a Connecticut insurance company with its principle place of business in Hartford, CT. Defendant Travelers Casualty Insurance Company of America is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Travelers Casualty Insurance Company of America may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

43.     Defendant The Travelers Indemnity Company is a Connecticut insurance company with its principle place of business in Hartford, CT. Defendant The Travelers Indemnity Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant The Travelers Indemnity Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

44.     Defendant Safeway Insurance Company is an Illinois insurance company with its principle place of business in Westmont, IL. Defendant Safeway Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Safeway Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

45.     Defendant Country Mutual Insurance Company is an Illinois insurance company with its principle place of business in Bloomington, IL. Defendant Country

Mutual Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant Country Mutual Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

46.     Defendant United Automobile Insurance Company is a Florida insurance company with its principle place of business in Miami Gardens, FL. Defendant United Automobile Insurance Company is registered with the Arizona Department of Insurance and is licensed to do business and is doing business within the State of Arizona. Pursuant to A.R.S. § 20-222(A), Defendant United Automobile Insurance Company may be served with process through the Director of the Arizona Department of Insurance at 2910 North 44th Street, 2nd Floor, Phoenix, Arizona 85018.

## JURISDICTION AND VENUE

47.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because Plaintiffs' claims arise under the Sherman Acts, 15 U.S.C. §§ 1. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

48.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this judicial district.

49.     Plaintiffs demand a jury trial on all issues triable by jury in this matter.

## FACTS

50.     Each individual Plaintiff is, or was, in the business of recovery and/or repair of motor vehicles involved in collisions.

51.     Each individual Defendant is an insurer providing automobile policies to consumers throughout the State of Arizona and insureds/claimants having repairs performed by Plaintiffs located within the State of Arizona.

52.     Each individual Plaintiff has done business at various times over the course of years with the Defendants' policyholders and claimants by providing to these policyholders and claimants motor vehicle collision repair service.  Each Defendant is individually responsible for payment for those repairs for their respective policyholders and claimants.

53.     Over the course of several years, the Defendants have engaged in an ongoing, concerted and intentional course of action and conduct with Defendants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (collectively, "State Farm") acting as the spearhead to improperly and illegally control and depress automobile damage repair costs to the detriment of the Plaintiffs and the substantial profit of the Defendants.

54.     One of the methods by which the Defendants exert control over Plaintiffs is by way of entering program agreements with individual body shops. Although each Defendant's program agreements have unique titles, such agreements are known generally and generically within the collision repair industry as direct repair programs ("DRPs").

55.     DRPs are presented to body shops as a mutually beneficial opportunity. In exchange for providing certain concessions of price, priority and similar matters, the Defendants would list a body shop as a preferred provider.

56.     However, the concessions demanded by the Defendants in exchange for remaining on the direct repair program were not balanced by purported benefits.  The Defendants, particularly State Farm, have utilized these agreements to exert control over the Plaintiffs' businesses in a variety of manners, well beyond that of an ordinary business agreement. This control even extends to and is applied upon body shops without DRPs.

57.     Defendants, particularly State Farm, have engaged in an ongoing pattern and practice of coercion and implied threats to Plaintiffs' pecuniary health in order to force compliance with unreasonable and onerous concessions.  Failure to comply results in either (or a combination of) removal from the program(s) (where applicable), improper steering of customers away from the Plaintiffs' businesses, or simply punishment to decrease the number of customers utilizing Plaintiffs' services.

58.     According to the National Association of Insurance Commissioners' 2013 Market Share Report, State Farm captured 17.1% of the private passenger automobile insurance business within Arizona.  The market share for its closest competitor, Zurich Insurance Group, which includes Defendants Zurich American Insurance Company, Farmers Insurance Company of Arizona and Farmers Insurance Exchange, was 11.7%. Progressive Group, which includes Defendants Progressive Preferred Insurance Company, Progressive Advanced Insurance Company and Progressive Casualty Insurance Company, and Berkshire Hathaway Group, which includes Defendants GEICO Casualty Company, GEICO General Insurance Company, GEICO Indemnity Company and Government Employees Insurance Company, held similar market shares at 10.92% and 10.69%, respectively.

59.     Collectively, the Defendants accounted for nearly 90% of the private passenger insurance market in Arizona in 2013. *See* Exhibit 1, NAIC Property/Casualty Insurance Industry by Line Market Share, Private Passenger Auto No-Fault (PIP) + Other Private Passenger Auto Liability (Arizona).

60.     Based upon the most recent information available, it is clearly apparent that State Farm holds the unchallenged dominant position within the automobile insurance industry in the Arizona market.

61.     The vast majority of Plaintiffs' business is generated by customers for whom the Defendants are responsible to pay repair costs. The insurance-paying customers account

for between seventy and ninety-five percent of each Plaintiffs' revenue. Courts have acknowledged the significant role played by insurance companies in funding automobile collision repairs, as well as the ability and market power to exert substantial influence and control over where consumers will take a wrecked car for repairs. See, e.g., *Allstate Ins. Co. v. Abbott*, 2006 U.S. Dist. LEXIS 9342 (N.D. Tex. 2006) (*aff'd*, *Allstate ins. co. v. Abbott*, 2007 U.S. App. LEXIS 18336 (5th Cir. 2007).

62.     As a general proposition, each DRP contains a general statement that the body shop will charge the respective insurance company no more for any particular repair than is the going market rate in the market area. However, body shops, including Plaintiffs, are not permitted to set their own rates.

63.     State Farm utilizes "surveys" to establish a "market rate." The geographical boundaries of the market area for the surveys are wholly within the control and direction of State Farm.

64.     Under the terms of its DRP, State Farm is not required to disclose any of the methods by which it establishes the market area, the market rate, or any other factual bases for its determination of the "market rate." The agreement contains no provisions for independent and neutral verification of the data utilized, nor any oversight not directly within the control and direction of State Farm. The shops, regardless of whether it is a DRP shop, are simply required to blindly accept State Farm's pronouncements regarding these matters.

65.     Previously State Farms' survey was conducted by sending written documents to the individual body shops. The owner or designated representative of the body shop would fill out the survey and return it to State Farm. In recent years, this process has been transferred to an electronic forum, State Farm's Business to Business portal, whereby the body shops go online to complete the survey.

66.     State Farm does not perform a survey in the traditional scientific sense, where information is obtained and results produced, establishing a baseline of all the body shops' information. With respect to labor rates, for example, State Farm's methodology does not represent what the majority of shops in a given area charge. Quite the contrary: State Farm's methodology lists the shops in a given market (as determined by State Farm) with the highest rates submitted at the top of the list and descending to the least expensive hourly rates at the bottom.

67.     State Farm then lists how many technicians a shop employs or the number of work bays available, whichever is lesser. Those are then totaled and State Farm employs it's "half plus one" method. If, for example, a State Farm determined market area has a total of fifty (50) technicians or work bays, State Farm's "half plus one" math equals twenty-six (26). With that number, starting at the bottom of the shop list, State Farm counts each shops' technicians or work bays until the "half plus one" number is reached—twenty-six in this example—and whatever that shop's rate happens to be is declared the market rate.

68.     There could, arguably, be some validity to this method if it accounted for the variance in shop size, skill of technicians and other quality variables; however, it does not. The greatest problem with this method is that State Farm can and does alter the labor rates that the body shops input, decreasing those arbitrarily deemed too high or higher than State Farm wishes to pay.

69.     By altering the rates entered, particularly those of the larger shops (*i.e.*, those with the most technicians and/or work bays), State Farm manipulates the results to achieve a wholly artificial "market rate." The results are therefore not that of an actual survey reflecting the designated market area but created from whole cloth by State Farm, particularly since State Farm determines the market area to be included.

70.     Furthermore, State Farm attempts to prohibit the shops from discussing with each other the information each has entered into the survey, asserting any discussion may

1
2
3

constitute illegal price fixing. Meanwhile, State Farm selects the geographical boundaries of the survey, retains the right to alter the survey results and does, in fact, alter the survey results. All without disclosure or oversight.

4
5
6

71.     Another electronic page on State Farm's business portal is known as the Dashboard/Scorecard. An exemplar of State Farm's Dashboard is attached hereto as Exhibit 2.

7
8
9
10

72.     The Dashboard has substantive impact on several levels. It serves as the record of an individual shop's survey responses. It also provides a "report card" and rating of the individual shop based primarily upon three criteria: quality, efficiency and competitiveness.

11
12

73.     Within the quality criterion, the shop's reported customer satisfaction, customer complaints, and quality issues identified by an audit are scored.

13
14
15

74.     The efficiency criterion evaluates repair cycle time, number of days a vehicle is in the shop, utilizing information input by the shops on the car's drop-off and pickup dates.

16
17
18
19

75.     The competitiveness criterion analyzes the average estimate for each State Farm repair, the cost of parts, whether a vehicle is repaired or replacement parts are utilized, the number of hours required to complete repair and similar matters. *See, e.g.,* Exhibit 2, at 2.

20
21
22
23
24

76.     In rating an individual shop, a total score of 1000 is possible. But State Farm is under no obligation to disclose the weight or total number of points possible given to each factor included in reaching the score, particularly those factors included under the competitiveness criterion. In fact, State Farm has refused to disclose its method of determining competitiveness even to its own team leaders.

25
26

77.     Due to this opacity, State Farm maintains complete and unsupervised authority to determine an individual shop's rating. It is therefore possible for a shop to have

no customer complaints, high customer satisfaction, no issues identified on an audit, complete compliance with all repair cycle time and efficiency expectations and yet still have a low rating. It is also possible for a shop to have multiple customer complaints, poor customer satisfaction, numerous issues identified on audit and complete failure to meet efficiency expectations and yet have a very high rating.

78. The Dashboard rating is very important as a shop's rating determines its position on the list of preferred providers. When a customer logs on to the State Farm website seeking a repair shop, those shops with the highest ratings are displayed first. A shop with a low rating will be at the bottom of the list often pages and pages down, making it difficult for a potential customer to find it. If a customer calls State Farm, the representative provides the preferred shops beginning with those holding the highest rating.

### SUPPRESSION OF LABOR RATES

79. State Farm's survey includes questions regarding, *inter alia*, the individual shop's hourly labor rate. The individual shops are supposed to provide accurate information to allow State Farm to calculate the market rate. The actual method of determining a market rate is described above.

80. If the labor rate information received is unilaterally deemed unacceptable by State Farm, a State Farm representative will contact the shop and demand the labor rate be lowered to an amount State Farm wishes to pay.

81. If the body shop advises that a labor rate increase is required, State Farm representatives will inform the body shop they are the only shop in the area who has raised its rates, therefore the higher rate does not conform to the "market rate" and State Farm will refuse to pay the requested rate.

82. At various points in time, State Farm has utilized this method of suppressing labor rates, telling each shop they are the only one to demand a higher labor rate when, in fact, multiple shops have attempted to raise their labor rates and advised State Farm of such.

By threatening shops with antitrust allegations, State Farm attempts to prevent shops from learning they are not the only shop seeking to raise its rates and thus exposing State Farm's falsehoods and manipulation.

83.     Should a shop persist in its efforts to raise its labor rate, State Farm will take one or more of several "corrective" measures. For example, State Farm agents have gone into the individual shop's survey responses and altered the labor rate listed without the knowledge or consent of the shop and used this lowered rate to justify its determination of the "market rate." State Farm has threatened to remove the shop from the direct repair program to coerce compliance. State Farm has removed shops from the direct repair program for not reducing their labor rates.

84.     The net effect of this tactic is to allow State Farm to manipulate the "market rate" and artificially suppress the labor rate for the relevant geographic area. An area, which, again, is defined solely by State Farm and is not subject to either neutral verification or even disclosure. This artificially created "market rate" is the maximum that will be paid, whether or not a given shop is a DRP shop.

85.     The remaining Defendants, intentionally and by agreement and/or conscious parallel behavior, specifically advised the Plaintiffs they will pay no more than what State Farm pays for labor. The Defendants have not conducted any surveys of their own in which the Plaintiffs have participated to determine market rates. The Defendants have agreed to join forces with State Farm, the dominant market holder, and each other to coerce the Plaintiffs into accepting the artificially created less-than-market labor rates through intimidation and threats to the Plaintiffs financial ability to remain operating.

86.     Additionally, these payment ceilings are enforced across the board by all Defendants.   Whether or not a shop is a member of a DRP, any DRP, is irrelevant. Defendants enforce the self-interested, artificially created rates against all shops, simply refusing to pay any more than they choose while explaining it away as "market rate."

## SUPPRESSION OF REPAIR AND MATERIAL COSTS

87.     Through various methods, the Defendants have, independently and in concert, instituted numerous methods of coercing the Plaintiffs into accepting less than actual and/or market costs for materials and supplies expended in completing repairs.

88.     Some of these methods include, but are not limited to: (1) refusal to compensate the shops for replacement parts when repair is possible though strongly recommended against based upon the shop's professional opinion; (2) utilizing used and /or recycled parts rather than new parts, even when new parts are available and a new part would be the best and highest quality repair to the vehicle; (3) requiring discounts and/or concessions be provided, even when doing so requires the shop to operate at a loss; and (4) *de facto* compulsory utilization of parts procurement programs.

89.     In addition to the above, the Defendants have repeatedly and intentionally failed to abide by minimum industry standards for auto repairs.

90.     Three leading collision repair estimating databases are in ordinary usage within the auto body collision repair industry: ADP, CCC, and Mitchell.

91.     These databases provide software and average costs associated with particular types of repairs to create estimates. The estimates that these databases generate include the ordinary and customary repairs, repair time (labor) and materials necessary to return a vehicle to its pre-accident condition. These databases and the estimates they generate are accepted within the industry as reliable starting points, subject to the shop's expert opinions and the necessarily present variability between the "best-case scenario"[1] presented by the procedure databases and the actual needs of a particular repair.

---

[1] The database procedure pages set forth the anticipated repairs, repair times and materials for repair of an undamaged vehicle using original manufacturer equipment, which are specifically designed to fit that particular vehicle.  Wrecked cars are obviously not undamaged and original manufacturer parts are not always used, particularly with repairs that State Farm and the other Defendants are responsible for payment, which can substantially affect repair procedures required, repair times and necessary materials.

92.     Over the course of years, the Defendants have admitted the accepted position of the estimating databases within the industry, but have nonetheless engaged in a course of conduct of refusing to make full payment for procedures and materials. Each of the Defendants have refused to allow Plaintiffs to perform required procedures and processes and/or refused to pay for them, thereby requiring the Plaintiffs to perform less-than-quality work or suffer a financial loss.

93.     A non-exhaustive list of procedures and processes that the Defendants have refused, and continue to refuse, to pay and/or pay in full is attached hereto as Exhibit 3.

94.     At the same time, Defendants selectively rely upon and assert the definitive nature of these databases when doing so is to their respective financial advantage.  For example, when a particular repair requires twenty hours of labor to complete but the database estimate notes fifteen hours of labor is standard for that type of repair, Defendants will cite the database estimate and pay for only fifteen hours of labor time.

95.     For example, upon information and belief, in June, 2014, Johnny Hurt—who holds a management position with Defendant Safeco Insurance Company of America— stated that payment according to procedures pages had been discussed just the previous week at a regional meeting and the corporate direction given was that procedure pages would only be paid when it was financially advantageous to the insurer to do so.

96.     With respect to materials, while it is inarguable that materials must be expended to repair automobile collisions, the Defendants simply refuse to pay for them, asserting materials are part of the cost of doing business. This is the Defendants' position even when the authoritative databases specifically state that such materials are not included in the repair procedure pages.

97.     The only partial exception to this practice is paint. While paint costs are factored into the amount the Defendants will pay, it is calculated via a formula which compensates the shops for only half the actual cost on average. The Defendants' method of

calculating paint payment fails to account for the type of paint needed/used, the requirement that paint be mixed to match the existing color of the vehicle, the actual amount of paint required to complete the job, the type of vehicle involved or any other factor. Defendants pay only based upon arbitrary caps, self-established and unrelated to actual costs to the Plaintiffs.

98.     This continued refusal and/or failure to compensate Plaintiffs for ordinary and customary repairs and materials costs places Plaintiffs in the untenable position of either performing incomplete and/or substandard repairs and thus breaching their obligation to automobile owners to return vehicles to pre-accident condition, or performing labor and expending materials without proper compensation and thereby jeopardizing continuing viability of the business enterprise.

99.     Although occurring in Mississippi, and set forth here for illustrative purposes, it was these very concerns that prompted a meeting in April, 2013, between many of the Plaintiffs in a companion case, *Capitol Body Shop, et al v. State Farm Mutual Automobile Association*, No. 3:14CV12, Southern District of Mississippi, and representatives of State Farm and the Mississippi Department of Insurance. Present on behalf of State Farm were Tim Bartlett, Estimatix team leader, John Findley, Estimatix section manager, and Steve Simkins, State Farm counsel for Mississippi and Alabama.

100.     At this meeting, members of the automobile collision repair industry expressed their dissatisfaction and concerns with the very practice of refusing to compensate fully and fairly for repairs that were performed and State Farm's inconsistent application of the database estimating software, *i.e.*, utilizing database estimates only when it is in State Farm's financial best interests to do so.

101.     State Farm's representative, Tim Bartlett, acknowledged that repairs and subsequent payment for those repairs should be consistent with the estimates prepared through the database software. Mr. Bartlett assured those present, including the Mississippi

Department of Insurance representative that it would begin abiding by those database estimates and stated it would raise the matter at its insurance industry meetings, held locally approximately once a month.

102.    Also at that meeting, Mr. Simpkins asked if insurance representatives might be permitted to attend the meetings of the Mississippi collision trade association. The association representative present for the meeting, John Mosley, invited State Farm to attend those meetings if State Farm would permit members of the association to attend the insurance meetings. Mr. Simkins refused.

103.    Despite the assurances given the body shop representatives and the Mississippi Department of Insurance at this meeting, State Farm has failed to perform in either Mississippi or Louisiana. State Farm, and the other Defendants in collusion with State Farm, have continued to refuse to make payment and/or full payment for necessary and proper repairs, labor and materials.

104.    State Farm also imposes restrictions upon the Plaintiffs' ability to obtain and utilize quality replacement parts and materials. As part of its DRP agreement, State Farm asserts it has the unilateral authority to enter into separate agreements with manufacturers, distributors or suppliers of automotive parts, supplies or materials.

105.    Despite the fact that the shops have no involvement in the negotiation of those separate agreements, they are de facto required to abide by the pricing agreements reached, even if they do not make purchases with those vendors. Although presented as an option to participate, the optional language is rendered nugatory by additional language that requires the shops to accept as payment only that amount for which the parts and/or materials could have been obtained through those agreements. Participation or lack thereof is therefore completely meaningless and the optional language is illusory.

106.    Moreover, shops are required to "stack" this purportedly optional usage of separate agreements with other discounts required elsewhere within the agreement. Thus,

the limitation on payment, refusal to compensate for nearly all materials and the compelled discounts end in a shop operating at or near a loss for each repair.

107.    Again, State Farm makes no distinction between DRP shops and non-DRP shops. Even the illusory promise of optional participation is absent. State Farm has enacted a widespread procedure of paying only the least amount for which a part *could* be obtained whether or not the least expensive part is appropriate or even purchased. Thus, if a bumper *could* be purchased from a vendor somewhere for $200.00, State Farm will only pay $200.00, even if the $200.00 bumper does not fit correctly and is not used.

108.    Though led by State Farm as the dominant market share holder, all Defendants have agreed to and/or consciously parallel the compensation ceilings established by State Farm solely for their own profit.

### STEERING

109.    The Defendants regularly and routinely engage in "steering" in order to punish the noncompliant Plaintiff shops. Through several common methods, the Defendants will "steer" insureds and/or claimants to favored, compliant shops through misrepresentation, insinuation, and casting aspersions upon the business integrity and quality of disfavored repair centers.

110.    Examples of this practice include advising that a particular chosen shop is not on the preferred provider list, advising that quality issues have arisen with that particular shop, that complaints have been received about that particular shop from other consumers, that the shop charges more than any other shop in the area and these additional costs will have to be paid  by the consumer, that repairs at the disfavored shop will take much longer than at other preferred shops and that the consumer will be responsible for rental car fees beyond a certain date, and that the Defendant cannot guarantee the work of that shop as it can at other shops.

111.   These statements have been made about certain Plaintiffs without any attempt to ascertain the truth thereof. Additionally, some of the ills recited, which implicitly criticize the shops, are wholly attributable to the insurer itself. The statement that repairs will take longer at a disfavored shop, for instance, is made without informing the insured that the delay in beginning repairs is due to the Defendants' decision to delay sending an adjuster/appraiser to evaluate the damage, which is a decision that is completely and wholly within the control of the Defendants. Asserting that the shops charge more than other shops is often not a function of what the shop actually charges but is the result of the Defendants' refusal to pay, also a factor wholly and completely within the control of the respective Defendant. Yet each of the Defendants convey such statements to their insureds as problems that are entirely the fault of Plaintiffs.

112.   The most egregious of these statements, that the Defendant cannot guarantee the Plaintiffs' work, is particularly misleading as none of the Defendants offer a guarantee for repair work. Instead, the Defendants require body shops to provide a limited lifetime guarantee on work performed. In the event additional work is required, Plaintiffs are required to do so without any additional payment, or to indemnify the insurer for costs if work is performed at another shop.

113.   Thus, while it may be a facially truthful statement that an insurer cannot guarantee the work of a particular shop, the clearly understood inference is that it can and will guarantee the work of another, favored shop, which is simply not true.

114.   The Defendants specifically and maliciously target the Plaintiffs as retribution for noncompliance with the fixed prices unilaterally imposed by the Defendants. The actions are intentional, improper and conducted with deliberate malice.

## INTENTIONAL NATURE OF DEFENDANTS' CONDUCT

115.   In 1963, a consent decree was entered in *United States vs. Association of Casualty and Surety Companies*, et al, Docket No. 3106, upon complaint filed in the

28

Southern District of New York. The allegations of that complaint included violations of Sections 1 and 3 of the Sherman Act, also known as the Sherman Antitrust Act.  A copy of this Decree is attached hereto as Exhibit 4.

116.   Specific actions supporting those allegations included: (l) requiring repair rather than replacement of damaged parts; (2) replacing damaged parts with used rather than new parts: (3) obtaining discounts on new replacement parts: (4) establishing strict labor time allowances; (5) suppressing the hourly labor rate; (6) channeling auto repairs to those repair shops which would abide by the insurer estimates and boycotting those which refused.   The complaint further alleged a conspiracy and combination in unreasonable restraint of trade and commerce for these practices.

117.   The Consent Decree order provided the following relief: (1) enjoined the defendants from placing into effect any plan, program or practice which has the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do  business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

118.   Whether or not any current Defendant is legally bound by this Decree, the actions described in the present cause fall squarely within those prohibited by the Decree. The Decree has been "on the books" for fifty years and is well-known within the insurance industry.  Despite this, the Defendants have willfully ignored actual knowledge of the terms of the Consent Decree.

119.   Being known, it can only be said that Defendants were fully aware their actions, plans, programs, and combinations and/or conspiracy to effectuate the same prohibited actions have been willful, intentional and conducted with complete and reckless disregard for the rights of the Plaintiffs.

## CLAIMS FOR RELIEF

## COUNT I: VIOLATIONS OF THE SHERMAN ACT: PRICE-FIXING

120.   Plaintiffs re-allege and incorporate by reference into this cause of action all allegations contained in paragraphs 1-119, as if set forth herein.

121.   The Sherman Act prohibits contracts, combinations or conspiracies in restraint of trade, 15 U.S.C. § 1. Such agreements are illegal if (1) their purpose or effect is to create an unreasonable restraint of trade, or (2) they constitute a per se violation of the statute.

122.   Through parallel actions, and\or explicit agreement, the Defendants have formed and engaged in a vertical conspiracy or combination to impose maximum price limits upon the Plaintiffs for their products and services.

123.   The United States Supreme Court has noted that agreements to fix maximum prices, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment. *Kiefer-Stewart Co. Vs. Joseph E. Seagram and Sons, Inc.*, 340 U.S. 211 (1951).

124.   The Defendants and co-conspirators have engaged in combination and conspiracy in unreasonable restraint of trade and commerce in the automobile damage repair industry.

125.   The aforesaid combination and/or conspiracy has consisted of a continuing agreement in concert of action among the Defendants and co-conspirators to control and suppress automobile damage repair costs, automobile material repair costs through coercion and intimidation of these shops.

126.   Evidence of this conspiracy or combination include, but is not limited to, admission before witnesses that members of the insurance industry meet regularly to discuss such matters in and amongst themselves but refuse to allow members of the auto collision repair industry to attend those meetings, explicit statements by Defendants that they will conform to State Farm's unilaterally imposed payment structure, admitting the baseline application of the industry database but failing to conform to that minimum standard, followed by the uniformity of action by all Defendants.

127.   The aforesaid offenses have had, among others, the effect of eliminating competition within the automobile damage repair industry, elimination of some shops from a substantial segment of the automobile damage repair industry for refusing or attempting to refuse the Defendants' arbitrary price ceilings, and subjecting repair shops to collective control and supervision of prices by the Defendants and co-conspirators.

128.   Neither the Plaintiffs, nor other members of the auto collision repair industry, are able to engage in competitive business practices as the Defendants have effectively and explicitly determined what their business practices will be.

129.   The Defendants actions individually and certainly collectively have violated federal law and directly caused the Plaintiffs to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief herein prayed for is granted.

### COUNT II: VIOLATIONS OF THE SHERMAN ACT: BOYCOTT

130.   Plaintiffs re-allege and incorporate by reference into this cause of action all allegations contained in paragraphs 1-129, as if set forth herein.

131.   The United States Supreme Court has repeatedly held that boycotts constitute a violation of the Sherman Act, 15 U.S.C. § 1. "'Boycott" has been defined within the antitrust law context as ''pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978).

132.    The Defendants have engaged, and continue to engage, in boycott and boycotting activity through their repeated actions of steering customers away from the Plaintiffs through allegations and intimations of poor quality work, of poor efficiency in performing work, of questionable business practices, of overcharging, impugning integrity, and similar actions so as to withhold and\or enlist others to withhold patronage from the Plaintiffs.

133.    This boycott was specifically designed to pressure, intimidate, and/or coerce the Plaintiffs into complying with the maximum-price limitations unilaterally conceived by State Farm and agreed to collusively by the other Defendants.

134.    It is irrelevant for purposes of the Sherman antitrust boycott activity that the Plaintiffs and Defendants are not direct competitors within the same industry.  The United States Supreme Court has directly addressed this issue in *St. Paul Fire and Marine Insurance Company*, supra, stating, "[B]oycotters and the ultimate target need not be in a competitive relationship with each other."  438 U.S. at 543.

135.    The enlistment of third parties as a means of compelling capitulation by the boycotted group has long been viewed as conduct supporting a finding of unlawful boycott. *Id.*

136.    In the present matter, the Defendants have engaged in not only a boycott, but have regularly, routinely and purposefully enlisted the aid of unwitting third parties in carrying out their boycott through their intentional acts of steering those customers away from the Plaintiffs.

137.    Defendants' boycott was created and carried out with the sole purpose and intent of financially coercing and threatening the Plaintiffs into complying with the Defendants price caps.

138.   The Defendants actions are violation of federal law and have directly caused the Plaintiffs to incur substantial damages.  Defendants are continuing and will continue said offenses unless the relief requested herein is granted.

**COUNT III: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**

139.   Plaintiffs re-allege and incorporate by reference into this cause of action all allegations contained in paragraphs 1-138, as if set forth herein.

140.   Tortious interference with a business relation occurs where a plaintiff has a valid contractual relationship or business expectancy, defendant knows of the relationship or expectancy, and defendant intentionally interferes with the relationship or expectancy causing a breach or termination that results in damages to the party whose relationship or expectancy has been disrupted. *Wagenseller v. Scottsdale Mem'l Hosp.,* 147 Ariz. 370, 386, 710 P.2d 1025, 1041 (1985) (superseded by statute in other respects).

141.   The Defendants, knowing of Plaintiffs' valid business relations and prospective business relations, intentionally engaged in actions and a course of conduct designed to interfere with and injure the Plaintiffs' valid business relations and prospective business relations.  The Defendants knowingly and intentionally steered and attempted to steer customers away from the Plaintiffs' through their repeated campaign of misrepresentation of facts, failure to verify facts that damage or tend to cause damage to the Plaintiffs' business reputations before conveying the same to members of the public, implications of poor quality, poor efficiency, poor business ethics and practices, and unreliability.

142.   The purpose of these actions was twofold: to punish the Plaintiffs who complained about or refused to submit to the various oppressive and unilateral price ceiling the Defendants were enforcing upon them, and to direct potential customers of the Plaintiffs to other vendors who would comply with the maximum price ceilings unilaterally imposed by the Defendants.

143.   The Plaintiffs have been damaged by the Defendants malicious and intentional actions.  Plaintiffs are therefore entitled to compensation for these damages.

### COUNT IV: UNJUST ENRICHMENT

144.   Plaintiffs re-allege and incorporate by reference into this cause of action all allegations contained in paragraphs 1-143, as if set forth herein.

145.   Unjust enrichment exists as a quasi-contractual obligation where services have been performed, the party receiving those services agreed to receive them, and there is an expectation of payment or compensation at the time the services were rendered.  *Blue Ridge Sewer Improvement District v. Lowery*, 718 P.2d 1026 (Ariz.App. 1986).

146.   Defendants' insureds and claimants entrusted the Plaintiffs with the full and complete repair of their vehicles, the cost of which it is incumbent upon the Defendants to pay. Plaintiffs expect payment for all services performed to fulfill their obligation to fully and completely repair the vehicles of Defendants' insureds and claimants. Defendants have failed to pay for the proper and fair repair of those vehicles. An obligation was thus created to provide payment to Plaintiffs for their work and expended materials.

147.   By failing to make payment and/or full payment for the necessary and reasonable costs of repair, Defendants have obtained or retained money which, in equity and good conscience, rightfully belongs to the Plaintiffs.

148.   There is no justification for Defendants retaining money that rightfully belongs to the Plaintiffs.

149.   There are no other appropriate remedies provided by law.

### COUNT V: QUASI-ESTOPPEL

150.   Plaintiffs re-allege and incorporate by reference into this cause of action all allegations contained in paragraphs 1-149, as if set forth herein.

151.   The doctrine of quasi-estoppel is based on election, ratification, affirmance, acquiescence or acceptance of benefits and precludes a party from asserting a claim

inconsistent with a position previously taken where it would be unconscionable to permit a person to maintain a position inconsistent with one in which he acquiesced or one in which he accepted a benefit. *Sailes v. Jones*, 17 Ariz. App. 593, 597 (1972).

152.   The Defendants have relied upon and asserted the validity and authority of the databases, discussed *supra*, when it has been to their respective advantage.  Indeed, Defendant Safeco admitted outright it would abide by the minimum standards set out by the databases only when it was to their financial advantage.  While Defendant Safeco has been the most candid about its inconsistent utilization of the databases, all Defendants have refused to compensate and/or fully compensate Plaintiffs for materials expended and work performed, including labor and labor rates, upon reliance of these very same guides, claiming they are unnecessary to complete the work at hand.

153.   Defendants' inconsistent and contradictory application of, or refusal to abide by, the guidelines of the industry databases has created an atmosphere of doubt, uncertainty and distrust, all to the severe detriment of Plaintiffs while, at the same time, seeking to obtain every improper advantage for Defendants themselves.

154.   Plaintiffs therefore seek to have the Defendants estopped from denying the applicability and reasonableness of the baseline procedures and costs set forth in the industry databases henceforth and make full payment for the necessary reasonable costs of repairs made for the benefit of Defendants' insureds and claimants.

## COUNT VI: CONVERSION

155.   Plaintiffs re-allege and incorporate by reference into this cause of action all allegations contained in paragraphs 1-154, as if set forth herein.

156.   Plaintiffs have performed necessary work and expended appropriate labor and materials for which Defendants have refused to make payment and/or full payment, even after demand for same.

157.   Defendants' action constitutes a conversion of Plaintiffs' monies.

158.   Defendants are therefore wrongfully in possession of monies which should have been expended to pay repair bills of their policyholders and claimants, specifically set aside for that purpose, and which rightfully belongs to Plaintiffs as a result of Plaintiffs performing  necessary reasonable and customary repairs to vehicles.

### **PRAYER FOR RELIEF**

159.   Plaintiffs incorporate and restate by reference herein all allegations set forth above.

160.   As a result of the Defendants' actions, Plaintiffs have been substantially harmed and will continue to suffer unless the relief requested herein is granted.   The Plaintiffs therefore pray for the following relief:

A.   Compensatory damages for all non-payment and underpayment for work completed on behalf of the Defendants' insureds and claimants as determined by a jury.

B.   Compensation for the lost revenue through artificia1 suppression of labor rates as determined by a jury.

C.   Damages sufficient to compensate Plaintiffs for lost business opportunities as determined by a jury.

D.   Treble damages, reasonable attorneys' fees and costs for violations of the Sherman Act, as required under 15 U.S.C. § 15.

E.   Injunctive relief prohibiting the Defendants from further engaging in any of the following:

1.   Placing into effect any plan, program or practice which has the purpose or effect of:

a)   directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any

Plaintiff automotive repair shop with respect to the repair of damage to automobiles.

    b)    fixing, establishing or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automobiles or for replacement parts or labor in connection therewith whether by coercion, boycott or intimidation, or by the use of flat rate or parts manuals or otherwise.

2.    Placing into effect any plan, program or practice which explicitly requires or has the purpose or effect of requiring Plaintiffs to participate in any parts procurement program.

3.    Providing untruthful and/or unverified information to customers or third persons regarding the quality, cost, efficiency or reputation of any Plaintiff ("steering").

4.    Prohibiting Defendant State Farm from altering or amending any Plaintiff response to its market labor rate "survey" without the express written permission of the affected Plaintiff.

F.    Punitive and/or exemplary damages sufficient to punish Defendants for their intentional acts and deter each Defendant and similar entities from pursuing this improper conduct in the future.

G.    Pre- and post-judgment interest.

H.    Any additional relief the Court deems just and appropriate.

/ / /

/ / /

1

DATED:        October 28, 2014

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.


By     s/ Eric D. Zard
       Elaine A. Ryan (AZ 012870)
       Van Bunch (AZ 009630)
       Eric D. Zard (AZ 027431)
       2325 East Camelback Road, Suite 300
       Phoenix, AZ  85016-3422
       Tel:  (602) 274-1100
       eryan@bffb.com
       vbunch@bffb.com
       ezard@bffb.com

       Attorneys for Plaintiffs