**IN THE UNITED STATES DISTRICT COURT FOR**

**THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION**

| | |
|---|---|
| LEGENDS COLLISION CENTER, LLC., *et al.*, | * <br> * <br> * |
| PLAINTIFFS, | * <br> * |
| | * MDL Docket No. 2557 |
| v. | * <br> * Case No. 14-cv-6006-GAP-TBS |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, *et al.*, | * <br> * ORIGINALLY FILED IN THE <br> * DISTRICT OF ARIZONA |
| DEFENDANTS. | * <br> * |

**MOVING DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6), the Defendants

listed in Exhibit A ("Moving Defendants") hereby move to dismiss the First Amended

Complaint ("FAC") (Doc. 93) with prejudice for, once again, failing to state a claim

upon which relief may be granted.   The inadequacy of this complaint was made

beyond debate by the Court's Order dated September 23, 2015 in A&E Auto Body,

Inc. v. 21st Century Centennial Ins. Co., No. 6:14-cv-310-Orl-31TB, 2015 WL

5604786 (M.D. Fla. Sept. 23, 2015) ("A&E Order") dismissing (with prejudice) the

complaint which was the forerunner of, and template for, this FAC.

**MEMORANDUM OF LAW**

In this case, there are only four (4) named Plaintiffs:  Legends Collision

Center, LLC ("Legends"), Jan's European Auto Body, Inc., ("Jan's"), Airport

1

Enterprises, Inc. ("Airport Auto"), and Robert K. Isham, an individual who sold his shop in 2012 ("Isham").  FAC ¶¶ 5-8.  They sue fifty-three (53) insurance company defendants.

The pleading deficiencies of the FAC have already been detailed in the initial Motions to Dismiss (Docs. 73, 74) and the Court's Order in this case (Doc. 91), as well as the Court's Orders in A&E Auto Body, Inc. v. 21st Century Centennial Ins. Co., No. 6:14-cv-00310, Docs. 110, 291 ("A&E") which provided ample guidance as to the inadequacy of the nearly identical Complaints filed in this MDL.  Unable to hide behind group pleadings, the FAC is a threadbare collection of isolated facts, relating to diverse subsets of Defendants.  The FAC comes nowhere close to alleging any agreement to fix prices or boycott by fifty-three (53) Defendants.  Similarly, the remaining state law claims of tortious interference and unjust enrichment continue to ignore the Court's many admonitions regarding shotgun and group pleadings and the need to allege specific facts.  Therefore, the FAC should be dismissed with prejudice.

I.      PLAINTIFFS' SHERMAN ACT CLAIMS (COUNT I AND COUNT II) SHOULD BE DISMISSED WITH PREJUDICE.

The FAC reveals a stunning lack of facts that could plausibly suggest an agreement among the fifty-three (53) Defendants that Plaintiffs have chosen to sue. To state a claim under Section 1 of the Sherman Act, a plaintiff must allege: (1) an agreement between two or more parties (2) that unreasonably restrains trade. Levine v. Cent. Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1545 (11th Cir. 1996). See also Duty Free Americas, Inc. v. Estee Lauder Companies, Inc., 946 F. Supp. 2d

1321, 1328-29 (S.D. Fl. May 9, 2013) ("Both § 1 and § 2 conspiracy claims 'require the same threshold showing – the existence of an agreement to restrain trade.'") (quoting Todorov v. DCH Healthcare Authority, 921 F.2d 1438, 1460, n. 35 (11th Cir.1991)).  This Court has already recognized that the "crucial question" on a Section 1 claim is whether the challenged conduct "stems from independent decision or from an agreement, tacit or express." A&E Auto Body, Inc. v. 21st Century Centennial Ins. Co., No. 6:14-cv-00310, 2015 WL 304048, at *9 (M.D. Fla. Jan. 21, 2015) (quoting Bell Atl. v. Twombly, 550 U.S. 544, 553 (2007)). See also A&E Order at *3.  As with the prototype complaint in the A&E case, this complaint should be dismissed for exactly the same reasons set forth in the A&E Order.

> A.     Plaintiffs Fail to Allege Parallel Action Among Defendants That Would Support a Plausible Inference of an Agreement to Fix Prices.

Recognizing that they have no facts alleging an agreement, Plaintiffs ask the Court to infer an agreement from parallel action.  But Plaintiffs do not even allege parallel action by fifty-three Defendants.  Rather, these four Plaintiffs ask the Court to infer parallel action from a few isolated allegations, and then to infer an agreement by drawing an inference from unalleged parallel actions.  Moreover, even an adequate "showing of parallel business behavior" can fail to suggest an agreement where there are other plausible explanations. A&E, 2015 WL 304048, at *9. Here, the FAC fails to allege facts showing parallel behavior, much less any supposed agreement that could be inferred from such parallel action.  Therefore, Plaintiffs' price-fixing claim must be dismissed.

1. Alleging a Failure By All Defendants to Pay the "Posted" Rate of Four Body Shops Does Not Support a Plausible Inference of an Agreement to Fix Prices Among All Defendants.

Plaintiffs purport to allege an agreement to fix prices paid by fifty-three (53) insurance companies to four body shops "in the Phoenix-metropolitan area…"  FAC ¶ 67.  But the facts alleged do not support a plausible inference of any agreement to fix prices.  According to the FAC, "Every Defendant insurer refuses to pay Plaintiffs' posted labor rate."  Id. ¶ 197.  The FAC never explains why the "posted rate" is relevant or meaningful. In fact, it is not. A body shop's posted rate is as meaningless as the "sticker price" in a car dealer's showroom. While that might be the price at which the seller would like to sell, it is not the actual, negotiated sale price at which sales are made in the market.

The "posted rates" of these four Plaintiffs are particularly meaningless for determining an actual market rate when the complaint, itself, recognizes that over 90% of all their business is coming from insurance companies who do not pay those posted rates.  FAC ¶¶ 178, 197.  The FAC provides no basis to infer that the Defendants were agreeing to fix prices simply because "every Defendant insurer contends that they will only pay the market labor rate for the market area."  Id. ¶ 198.  Plaintiffs fail to show that the market rate for all body shops in Arizona or for the "Phoenix-metropolitan area" is something other than the actual price that is being paid to - and accepted by – the multitude of other body shops in Arizona and the Phoenix metropolitan area (as well  these four Plaintiffs' shops).

The FAC suggests that all Defendants have been paying a labor rate of

$48/hour since 2008.  See id. ¶¶ 219-27.  Even if this were true, there is no plausible inference of an agreement to fix prices. There is no allegation of parallel multiple price changes during this time. And there is no inference that a competitive market price was something else.  As the Court stated in its September 23, 2015 Order in A&E, "The alleged behavior of the Defendants - i.e., paying the same rates…is not enough, on its own, to violate Section 1 of the Sherman Act."  A&E Order at *4.

Upon close examination, the FAC does not even allege that all Defendants actually paid the same $48/hour rate to all four Plaintiffs.  For example, the FAC alleges that "Defendant insurers all refuse to pay Plaintiff Airport Auto more than $48.00 per hour for body, refinishing and paint labor."  FAC ¶ 226 (emphasis added). This paragraph does not actually say that all Defendants are paying $48, merely that they won't pay more to this one body shop, Airport Auto.

Any suggestion that all Defendants were actually paying the same rate to all four Plaintiffs (let alone all shops in Arizona) is further weakened by the juxtaposition of Paragraphs 225 and 227, which list only some Defendants who have refused to pay more than $48/hour.   For example, Defendant Hartford is not listed in Paragraphs 225 or 227.  Obviously, there is no suggestion of Hartford being part of an agreement to fix prices at $48/hour when there is no allegation regarding Hartford paying that price – or any price – to Legends (¶ 225) or Jan's (¶ 227).   And this pleading failure is not unique to Hartford.  There is no reference to any of these other Defendants in Paragraph 225: CSAA; Nationwide; Sentry; Metropolitan; Infinity; Travelers; Safeway; UAIC; and Mercury.  Likewise there is no reference to any of

these other Defendants in Paragraph 227: CSAA; Sentry; Metropolitan; Infinity; Country Mutual; and Mercury.

Moreover, there is no allegation as to the price that <u>any</u> Defendant was paying to Plaintiff Isham, or his former shop.  These disparities show that there was an <u>absence</u> of uniform or parallel prices among all Defendants.  Without parallel action, there is no plausible basis to infer an agreement among all Defendants to fix prices.

2.    There Exist Many Explanations More Plausible Than "Collusion" to Explain Similar Prices.

Even if it were assumed, arguendo, that the FAC did allege parallel pricing – which it has failed to do – that would not plausibly imply any agreement:

It is not illegal for a party to decide it is unwilling to pay a higher hourly rate than its competitors have to pay, and the fact that a number of the Defendants made statements to that effect does not tip the scales toward illegality.  The Sherman Act does not restrict the "long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell.

<u>A&E</u>, 2015 WL 304048, at *10.  <u>See also</u> <u>A&E</u> Order at *4; <u>Quality Auto Body, Inc. v. Allstate Ins. Co.,</u> 660 F.2d 1195, 1204 (7th Cir. 1981) ("[T]he insurer's refusal to pay more than the prevailing competitive rate is not illegal.").

The Plaintiffs leap to the unwarranted conclusion that anytime two or more competitors pay the same rate, it must be because of an agreement among competitors to fix prices.  FAC ¶¶ 220, 222.  To the contrary, courts and economists would expect to see prices being matched in a competitive market.  <u>In re Graphics</u>

Processing Antitrust Litig., 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007) ("We must remember that competitive market forces will tend to drive the prices of like goods to the same level, so like prices on like products are not, standing alone, sufficient to implicate price-fixing.").  See also Quality Auto Body, 660 F.2d at 1205 ("the practice of the insurance companies to calculate the reimbursement for its insured based upon the lowest prevailing price in the market place (and to insure the integrity of that estimate by having an open list of competing shops which will generally accept it) is the very essence of competition.") (quoting Chick's Auto Body v. State Farm Mutual Auto. Ins. Co., 168 N.J. Super. 68, 87 (1979)).  In a competitive market, price should be the same or close to it.

Rather than collusion among insurers, the more plausible explanation for similar prices would be the insurance companies, which are in the market on a daily basis obtaining repair services, know the prices at which competitive shops will accept work. Moreover, body shops would tell every other insurer when State Farm (or some other insurer) was paying a higher price; the body shops would demand that each insurer increase its price as well.  The body shops are sellers.  And they would have an incentive to notify all insurance company buyers that the body shops have gotten (and are now demanding) higher prices.

To put this proposition in the more familiar context where sellers are being accused of price fixing, it is common for buyers to tell sellers that the buyers are able to obtain goods or services from the sellers' competitors at lower prices, and demand that sellers meet those lower prices. See, e.g., Int'l Air Indus., Inc. v. Am.

Excelsior Co., 517 F.2d 714, 726 (5th Cir. 1975) (noting that buyers often told manufacturers their competitors' prices to induce discounts); Walker v. Hallmark Cards, Inc., 992 F. Supp. 1335, 1340-41 (M.D. Fla. 1997) (meeting competition defense satisfied where defendant received and relied upon reliable reports of competitors' offers and terms).

Another plausible way for insurers to learn the rates being paid to shops would be through their common network of DRP shops.  The FAC expressly alleged that many insurers have DRP shops and these are subject to "most favored nations" clauses on price.  FAC ¶ 152.  Plaintiffs themselves admit they are or have been DRP shops during the relevant period.  Id. ¶¶ 161-63.  So any price matching is plausibly explained outside the speculation of collusion.  Even if these four shops were not DRP shops, they would still have to compete for business with DRP shops and all other body shops willing to do the work for less than the "posted" prices of these four. And the insurers who are dealing with these DRP shops would also learn more about competitive price in the market, without any collusion. In short, there are more plausible explanations than Plaintiffs' unsupported speculation of collusion.

3.     The Hodge Podge of Alleged Repair Practices Refutes Any Contention of Parallel Action from which to Infer Price Fixing.

In a further attempt to conceal the lack of facts showing parallel pricing behavior, Plaintiffs serve up a disjointed smorgasbord of non-price practices.  But the facts alleged show differences more than any parallel action or agreement between all Defendants.

As to the industry-wide use of one of three estimating databases (FAC ¶ 233-

62), this Court has already held that the allegations regarding the use of estimating

databases were insufficient to state a Section 1 Claim:

> As with the refusal to pay more than State Farm's allegedly depressed
> market rate, there is nothing about the refusal to pay in accord with
> repair-estimating databases, standing alone, that suggests that the
> Defendants are acting out of anything other than their own economic
> self-interest. And the Plaintiffs have not placed this refusal to adhere to
> the databases in a context that suggests a preceding agreement. See
> Twombly, 550 U.S. at 557, 127 S.Ct. at 1966. They do not, for
> example, allege that the Defendants formerly accepted the databases
> as authoritative but, around the same time, stopped doing so. In fact,
> the Plaintiffs do not allege that any of the Defendants ever strictly
> abided by the databases.
>
> It is not even clear that the Defendants' actions in regard to the
> databases could even be described as parallel behavior. The
> Defendants are not alleged to have acted uniformly, such as by only
> agreeing to pay the same fraction of the estimate provided by a
> database. Accepting the Plaintiffs' allegations as true, the Defendants
> are simply refusing to be bound by third-party estimates that they are
> not legally obligated to follow.

A&E, 2015 WL 304048, at *11.  The substance of the allegations here is the same

as in A&E.  Compare FAC ¶¶ 233-62 with A&E SAC (Doc. 296) ¶¶ 189-225.  The

deficiencies identified in A&E are the same as in the FAC:  (1) there is no allegation

that the defendants, all at the same time, stopped accepting the databases as

authoritative; (2) there is no allegation that the Defendants ever strictly adhered to

the databases; and (3) there is no allegation that the Defendants ever agreed to pay

the same fraction of an estimate provided by a database.  Thus, the same result

should be found here.

Nor are the meager allegations about repair practices – "feather, prime and

block"; "color matching"; "repairing and refinishing pinch-welds"; and "denib and

finesse" (FAC ¶¶ 256-62) – indicative of collusion.  See A&E Order at *6 (describing allegations regarding "denib and finesse".  Moreover, the specific allegations regarding various repair procedures are leveled against only a few Defendants (aside from "feather, prime and block", which is improperly generally alleged against "all Defendant insurers").  This diversity underscores the fact that not all Defendants are taking uniform action.

For example, the FAC alleges that State Farm, USAA, Allstate, Liberty Mutual, GEICO, and Nationwide refuse to pay for denib and finesse.  FAC ¶ 261. Notably absent from that paragraph are any allegations as to whether any Defendants from the corporate families Farmers, Progressive, American Family, Hartford, CSAA, Sentry, Metropolitan, Infinity, Travelers, Safeway, Country Mutual, UAIC, or Mercury similarly refuse to pay for that procedure.  Of course, whether those Defendants pay for the procedure would be within the knowledge of the Plaintiffs, so the absence of that information speaks volumes.

Similarly, the FAC alleges that Farmers, Progressive, GEICO and USAA have told Plaintiff Legends statements like "if we pay tint, we do not pay blend."  FAC ¶ 259.  A carrier's statement that it will not reimburse an auto body repair shop for one specific procedure versus another, in and of itself, cannot provide a basis to infer the sweeping conspiracy alleged by plaintiffs.  In any event, there are no allegations as to similar statements by any Defendants from the following corporate families: State Farm, Allstate, American Family, Liberty Mutual, Hartford, CSAA, Nationwide, Sentry, Metropolitan, Infinity, Travelers, Safeway, Country Mutual, UAIC, or Mercury.

It is fundamental that the variation alleged by Plaintiffs undermines their assertion of a cohesive and uniform group taking parallel action. See, e.g., In re Baby Food Antitrust Litig., 166 F.3d 112, 132 (3d Cir. 1999) (affirming summary judgment where the facts "refute rather than support" plaintiffs' allegations of parallel conduct). See also In re Beef Indus. Antitrust Litig., 907 F.2d 510, 514 (5th Cir. 1990) ("When an antitrust plaintiff relies on circumstantial evidence of conscious parallelism to prove a § 1 claim, he must first demonstrate that the defendants' actions were parallel. The cattlemen have not done this.") (citations omitted); Aviation Specialties, Inc. v. United Technologies Corp., 568 F.2d 1186, 1192 (5th Cir. 1978) (plaintiff "brought forth no evidence of parallel behavior suggesting an unlawful agreement").

    B.    <u>Plaintiffs Fail to Allege an Agreement to Boycott.</u>

The group boycott claim (Count II) also fails because there is no factual basis for inferring any agreement.  As with price-fixing, a fundamental element of a group boycott claim is an agreement.  See A&E, 2015 WL 304048, at *12 ("In addition, to state a claim for a violation of § 1 by way of a boycott also requires allegations plausibly suggesting an agreement by the Defendants.").  The FAC shows disparate – not parallel – action by the various Defendants.

Furthermore, Plaintiffs fail to allege any "concerted refusal to deal" – a requirement for any boycott claim under the Sherman Act. In A&E, this Court identified the deficiency with regard to the "steering" allegations in that Complaint: "[T]here is no allegation that any Defendant refused to allow any of its insureds to

obtain a repair from such a shop, or refused to pay for repairs performed at such a shop." A&E, 2015 WL 304048, at *10.  See also A&E Order at *7 ("Even accepting the allegations as true, they in no way suggest that the Defendants have engaged in a concerted refusal to deal.").

Here, as in A&E, there are no allegations of steering whatsoever as to most Defendants.[1]  See FAC ¶¶ 293-328.  As to the others, the few meager allegations advanced by Plaintiffs fail to identify any refusal by any Defendant to allow insureds to obtain a repair, or to pay for such repairs.  In fact, they tend to show the opposite.  See, e.g., id. ¶¶ 318, 326, 327.  Indeed, far from alleging that all Defendants refused to deal with any of the Plaintiffs, the FAC alleges that Defendants did deal with the Plaintiffs – the Plaintiffs just wanted bigger payments.  See A&E Order at *6-7.

In another failed attempt to conjure up an agreement to boycott, the FAC alleges that Jan's and Airport Auto experienced a decline in business from four insurer Defendants – Farmers, State Farm, Liberty Mutual, American Family – from January 1, 2015 to September 15, 2015.  Id. ¶¶ 319, 325-28.[2]  On its face, this allegation contradicts the notion that even individual Defendants refused to deal with Plaintiffs.[3]  In any event, the FAC says nothing about any lost business from all other

---

[1] No defendants from the following corporate families are mentioned in the "Steering" section of the FAC:  USAA; Hartford; CSAA; Nationwide; Sentry; Metropolitan; Infinity; Travelers; Country Mutual.  See FAC ¶¶ 293-328.

[2] Even for these alleged volume drops, the change in numbers is so small that they could easily be due to random variation.  See, e.g., id. ¶ 326 (alleging that while expecting to repair 20 vehicles during an 8 month time period, repairing 13); id. ¶ 327 (alleging that while expecting to repair 8 vehicles during an 8 month time period, repairing 2); id. ¶ 328 (alleging that while expecting to repair 12 vehicles during an 8 month period, repairing 6).

[3] Further, the allegation itself is pure speculation.  Plaintiffs elsewhere allege that Jan's

insurer Defendants.  The most logical implication from this omission is that the conduct of all other Defendants would contravene Plaintiffs' theory of collusion or group boycott.

Ignoring the absence of any allegation of lost business from the majority of Defendants, Plaintiffs offer this implausible speculation:  "Evidence of Defendant insurer's concerted boycotting against [sic] insurers includes . . . timing of boycotting to engage with intentional punishment directed by one or two insurers and enlisting the other Defendants into boycotting a particular Plaintiff at the same time."  Id. ¶ 453.  But an alleged reduction in work from only four insurers out of a much larger group does not suggest a group decision by fifty-three Defendants to withhold business.  Further, Plaintiffs fail to account for many other more plausible reasons for a reduction in business from these four insurers.  For example, those insurers could have been making a decision to exit the Arizona market (or that portion of the State); they could have lost business to other insurers; and perhaps, the work declined due to safer drivers or less expensive repairs.

Indeed, the FAC, itself, indicates that shops should expect an increase of business when they become DRPs.  Id. ¶ 152 ("the body shops would receive a higher volume of customers"), ¶ 155 ("volume promise in exchange for discount").  Obviously, if they expected an increase when becoming a DRP shop, they should expect the volume would drop when the shop stopped being a DRP.  As this Court

---

remains a "current DRP shop for Farmers Defendants and has been for over twenty-years.  Id. ¶ 163.

previously concluded in <u>A&E</u>, a few, isolated allegations of attempted steering or lost business involving single body shops and a few Defendants "fails to state a boycott claim.  Even accepting the allegations as true, they in no way suggested that the Defendants have engaged in a concerted refusal to deal."  <u>See</u> <u>A&E</u> Order at *7. The same can be said here.

C.    <u>Opportunities to Conspire Fail to Show Agreement.</u>

Plaintiffs allege that there have been numerous "opportunities for Defendants to conspire," as a result of trade association memberships.  <u>See</u> <u>id.</u> ¶¶ 347-73. Here, to, there is no specific reference to any of the following Defendants in this section:  Farmers; American Family; CSAA; Sentry; Metropolitan; Infinity; Safeway; Country Mutual; UAIC; Mercury.

Regardless, these bare allegations of "opportunities to conspire" are insufficient to demonstrate any alleged agreement among the Defendants:

> The class posits that PM, RJR, B&W and Lorillard enjoyed numerous opportunities to conspire, and that this supports their collusion claim. We unambiguously held in Todorov, however, that "the mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy." 921 F.2d at 1456 (<u>citing</u> <u>Bolt v. Halifax Hosp. Med. Ctr.</u>, 891 F.2d 810, 827 (11th Cir.1990), <u>overruled in part on other grounds</u> by <u>City of Columbia v. Omni Outdoor Adver.</u>, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991)). Indeed, the opportunity to fix prices without any showing that appellees actually conspired does not tend to exclude the possibility that they did not avail themselves of such opportunity or, conversely, that they actually did conspire. Appellants may not rely on this proposition to support their allegations in this case.

<u>Williamson Oil</u>, 346 F.3d at 1319. These allegations regarding diverse trade

association memberships do nothing to show an agreement.[4]  A&E Order at *5

("Even if all of the Defendants had been members of one such organization, it would

not aid the Plaintiffs' efforts to state a claim, because participation in trade

organizations 'provides no indication of conspiracy.'").

II.     PLAINTIFFS' CLAIMS OF TORTIOUS INTERFERENCE WITH
        BUSINESS RELATIONS (COUNT III) AND UNJUST ENRICHMENT
        (COUNT IV) SHOULD BE DISMISSED WITH PREJUDICE.

Both remaining state law claims (Tortious Interference with Business

Relations and Unjust Enrichment) should be dismissed for failure to allege any act

by any Defendant with regard to any Plaintiff.  The allegations of Counts III and IV do

not specifically mention a single Defendant, a single Plaintiff, or a single customer.

See FAC ¶¶ 461-477.

Count IV, along with Counts I and II, also improperly attempts to incorporate

every allegation in the Complaint, which "is a prohibited 'shotgun pleading'" that this

Court informed the Plaintiffs over a year ago was improper:

> Every allegation in the first 121 paragraphs of the Complaint is
> incorporated into the first count (titled "Quantum Meruit"), which begins
> at paragraph 122 and ends at paragraph 126. Every allegation in the
> first 126 paragraphs of the Complaint is incorporated into the second
> count ("Unjust Enrichment"), which begins at paragraph 127 and ends
> at paragraph 131. And so on through all remaining counts ("Quasi-
> Estoppel," "Tortious Interference," "Conversion," "Violation of the
> Sherman Act – Price-Fixing," and "Violation of the Sherman Act –
> Boycott"). Thus the Complaint is a prohibited "shotgun pleading," with
> each count incorporating irrelevant allegations. See, e.g., Strategic
> Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293
> (11th Cir. 2002). Dismissal is required.

---

[4] Going from baseless speculation to desperation, Plaintiffs offer some investment theory in
Blackrock as a supposedly "plausible" explanation.  FAC ¶¶ 381-404.

A&E, Order dated June 11, 2014, at 1 (Doc. 110).  In that same order, Plaintiffs were

also warned about their improper attempts at group pleading, particularly for causes

of actions, like tortious interference and unjust enrichment, that would require

particularized allegations:

> With limited exceptions, the allegations of wrongdoing are attributed, collectively, to every Defendant and alleged to have been perpetrated upon every Plaintiff. . . . For example, if Plaintiffs' counsel were able to establish that Defendant A was unjustly enriched by shortchanging Plaintiff B, it would not entitle any other plaintiff to a judgment against Defendant A (or any other defendant). However, that is the way this action has been pleaded. If the Plaintiffs choose to replead, this must be corrected.

Id. at 2.  Yet, despite these admonitions, and further guidance provided by

Magistrate Judge Smith (see, e.g., Report and Recommendation dated June 3, 2015

(Doc. 83) ("Omnibus R&R") at 10-11 ) and again from Judge Presnell (see, e.g.,

Brewer, 2015 WL 1911418, at *1) in related cases, Plaintiffs here continue their

improper group and shotgun pleading attempts.  As aptly stated by this Court over

15 months ago, "Dismissal is required."

A.      The Tortious Interference Claim Is Deficient.

As to the majority of the Defendants, Plaintiffs say nothing at all, confirming

that Plaintiffs have no facts to support claims against them.  See A&E Order at *10

n. 8 (noting that failure to include allegations of tortious interference regarding 34 of

39 defendants warranted dismissal with prejudice as to those 34); Omnibus R&R at

39 ("Absent well pled allegations that the Defendants joined in a conspiracy or acted

in concert, liability for tortious interference must be established on an individualized

basis.").

Plaintiffs offer but a handful of terse allegations of attempted "steering" regarding only a few Defendants, none of which are sufficient to meet Plaintiffs' pleading burden.  See FAC ¶¶ 293-328.  Despite including only a small number of insufficient allegations against a subset of Defendants, Plaintiffs bring their tortious interference claim against all Defendants.  See id. ¶¶ 463-466.  As described above, this type of generalized group pleading has been repeatedly rejected.  See Omnibus R&R at 39 ("For the reasons I have already explained, all of the Plaintiffs' complaints fall short of this standard because they attribute 'allegations of wrongdoing . . . collectively to every Defendant.'"); A&E Order at *10 ("Plaintiffs have not pled any facts showing that more than a single Defendant was involved in any of the alleged incidents of steering or that more than a single Plaintiff suffered a loss of business as a result of any such incident.").

Further, Arizona recognizes the multi-factor test outlined in Restatement (Second) of Torts § 767 to determine when any interference is actually improper.  See Omnibus R&R at 35 (citing  Wagenseller v. Scottsdale Memorial Hospital, 710 P.2d 1025, 1041 (Ariz. 1985) superseded by statute on other grounds as stated in, Powell v. Washburn, 125 P.3d 373 (Ariz. 2006)).  To the extent any of the steering allegations actually satisfy the requirements under Arizona law as to any particular Defendant – and they do not – Defendants are not prohibited from interfering with another's prospective contractual rights for a legitimate competitive reason.  See Bar J Bar Cattle Co., Inc. v. Pace, 763 P.2d 545, 549 (Ariz. Ct. App. 1988) ("One who

interferes with the prospective contractual rights of another 'for a legitimate

competitive reason does not become a tortfeasor simply because he may also bear

ill will toward his competitor.'") (citation omitted)).  Here, Defendants have contracts

with their insureds, and thus any alleged "interference" with any business

relationship (prospective or otherwise) between any of the Defendants and their

insureds would be privileged.  See Gunder's Auto Center v. State Farm Mut. Auto.

Ins. Co., 422 Fed. App'x 819, 822 (11th Cir. 2011) ("as insurance companies are not

strangers to the relationship between an auto-body shop and an insured, the

insurer's acts are privileged and it cannot be held liable for tortious interference.").

### B.    The Unjust Enrichment Claim Is Deficient.

Plaintiffs have chosen to plead unjust enrichment as if they never read this

Court's sua sponte Order dismissing the original complaint in that A&E case:

> With limited exceptions, the allegations of wrongdoing are attributed,
> collectively, to every Defendant and alleged to have been perpetrated
> upon every Plaintiff. While there may be situations in which such
> collective descriptions are sufficient, at least some of claims asserted
> here require individualized allegations.  For example, if Plaintiffs'
> counsel were able to establish that Defendant A was unjustly enriched
> by shortchanging Plaintiff B, it would not entitle any other plaintiff to a
> judgment against Defendant A (or any other defendant). However, that
> is the way this action has been pleaded. If the Plaintiffs choose to
> replead, this must be corrected.

Order, A&E (Doc. 110) at 2.  The FAC still improperly alleges that all Plaintiffs were

harmed by all Defendants without providing any specifics as repeatedly instructed by

this Court, which is grounds for dismissal.  A&E Order at *10 n.9 ("[T]he Plaintiffs in

Count IV have asserted a single quantum meruit claim against all of the Defendants,

as though all of the Plaintiffs collectively did something (or some things) that

conferred a benefit on the Defendants as a group.").

   While the persistent pleading defects alone warrant dismissal, the unjust enrichment claim fails substantively as well.  To state a claim for unjust enrichment under Arizona law, a "plaintiff must demonstrate that the defendant received a benefit, that by receipt of that benefit the defendant was unjustly enriched at the plaintiff's expense, and that the circumstances were such that in good conscience the defendant should provide compensation." Freeman v. Sorchych, 245 P.3d 927, 936 (Ariz. Ct. App. 2011).  Thus, "in order to prevail upon a theory of unjust enrichment, a plaintiff must establish that [the] plaintiff conferred a benefit upon the defendant". USLife Title Co. of Arizona v. Gutkin, 732 P.2d 579, 584 (Ariz. Ct. App. 1986).

   Plaintiffs do not allege any facts showing that the Plaintiffs conferred a benefit on the Defendants.  Rather, they performed auto body repair work for vehicle owners, which merely ripened the insurers' obligation to pay for repairs.  This is hardly a benefit to the insurers.  A&E, 2015 WL 304048, at *5 ("The repairs at issue obviously provided a benefit to the owners of the vehicles. But so far as the FAC discloses, the only effect of such a repair on the insurance company is the incurring of an obligation to pay for it.").  See also Adventist Health System / Sunbelt Inc. v. Med. Savings Ins. Co., No. 6:03-cv-1121- Orl-19KRS, 2004 WL 6225293, at *6 (M.D. Fla. Mar. 8, 2004) ("[A] third-party providing services to an insured confers nothing on the insurer except, a ripe claim for reimbursement, which is hardly a benefit.").

Further, there is nothing unjust or unexpected when the body shop repeatedly performs repairs knowing what insurers would pay.  See A&E Order at *11.  See also Flooring Sys., Inc. v. Radisson Grp., Inc., 772 P.2d 578, 581 (Ariz. 1989) ("In determining whether it would be unjust to allow the retention of benefits without compensation . . . [w]hat is important is that it be shown that it was not intended or expected that the services be rendered or the benefit conferred gratuitously, and that the benefit was not 'conferred officiously.'") (internal citations omitted); Freeman, 245 P.3d at 937 (Ariz. Ct. App. 2011) (to recover on a claim for unjust enrichment, a plaintiff must show that benefit was not "conferred officiously").

Finally, the repair of the automobile for the owner is subject to a contract between the body shop and the owner, regardless of whether the owner has an additional contractual right for the insurer to pay for the services rendered to the auto owner.  Plaintiffs were paid for their work under their contracts; they simply want more money for the work they already performed.  See Omnibus R&R at 27 (citing 1 Dobbs, Law of Remedies § 4.9(4)).

III.      THE ENTIRE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.

Plaintiffs have no right to file yet another Complaint. "The district court . . . need not 'allow an amendment (1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." Corsello v. Lincare, Inc., 428 F.3d 1008, 1014 (11th Cir. 2005).

There can be no question that the Court has the inherent power to dismiss this Complaint with prejudice based on the need to manage its docket, particularly in an MDL.  Dinardo v. Palm Beach County Circuit Court Judge, 199 Fed. App'x 731, 735 (11th Cir. 2006) ("A court may dismiss a case with prejudice based on . . . the court's inherent power to manage its docket.").  Moreover, the Court can require Plaintiffs' counsel to pay the attorneys' fees of Defendants' counsel in having to move to dismiss the amended complaint as a sanction under 18 U.S.C. § 1927 for repeatedly ignoring the Court's instructions on pleading requirements and filing deadlines.  See Omnibus R&R (identifying multiple cases where Plaintiffs continue to ignore the pleading instructions of the Court); A&E Order at *10, 11 n.9.

Although this is technically Plaintiffs' first Amendment in this case, Plaintiffs have been on notice of the problems with these allegations repeatedly throughout this MDL proceeding.  Copy-cat complaints were first filed in January 2014, and not a single complaint that the Eaves law firm has filed to date in the approximately 20 MDL cases has survived a motion to dismiss.  In its orders in A&E dismissing the original and First Amended Complaint (A&E (Docs. 110, 291)), and the numerous Report and Recommendations (and Orders adopting the Report and Recommendations) in other constituent cases doing the same (see, e.g., Brewer Body Shop, LLC v. State Farm Mutual Auto. Ins. Co., __ F. Supp. 3d __, 2015 WL 1911418 (M.D. Fla. Apr. 27, 2015)), this Court has already provided clear instructions to the Plaintiffs as to how to cure their pleading deficiencies.  They have chosen to ignore those instructions and have "not come remotely close to satisfying

the minimum pleading requirements as to any of the claims asserted."  A&E Order at

*12.  Defendants should not be forced to incur the expense of drafting motions to

dismiss complaints which Plaintiffs either cannot, or will not, remedy.

Plaintiffs have had nearly a year to draft a complaint that satisfies Twombly

and the Federal Rules of Civil Procedure.  They have still failed to do so, and should

not be granted yet another try. Thus, the FAC should be dismissed as to the Moving

Defendants with prejudice.[5]

## CONCLUSION

For the reasons set forth herein it is requested that this Court dismiss the First

Amended Complaint with prejudice.

Dated October 9, 2015                          Respectfully submitted,

By: /s/ Thomas G. Rohback                 /s/ David L. Yohai
Thomas G. Rohback                         David L. Yohai
AXINN, VELTROP & HARKRIDER LLP            WEIL, GOTSHAL & MANGES LLP
90 State House Square                     767 Fifth Avenue
Hartford, CT 06103                        New York, New York 10153
Phone: (860) 275-8100                     Telephone: (212) 310-8000
Facsimile: (860) 275-8101                 Fax: (212) 310-8007
trohback@axinn.com                        david.yohai@weil.com

Attorneys for Defendants Hartford         Counsel for Farmers Insurance Company of

---

[5] See, e.g., Aquatherm Indus., Inc. v. Florida Power & Light Co., 145 F.3d 1258, 1264 (11th
Cir. 1998) (affirming dismissal with prejudice because "we conclude Aquatherm can prove
no set of facts in support of its claims which would entitle it to relief under the federal
antitrust laws"); Ivanovic v. Overseas Mgmt. Co., No. 11-80726-CIV, 2011 WL 5508824, at
*4 (S.D.Fla. Nov. 09, 2011) ("As Plaintiff fails to . . . satisfy basic federal pleading standards,
the Amended Complaint must be dismissed as to all eight moving Defendants for failure to
state a claim. Such dismissal should be with prejudice because Plaintiff has already once
been granted an opportunity to amend and it is apparent that any further amendment would
be futile.").

| | |
|---|---|
| Casualty Insurance Company and Hartford Insurance Company of the Midwest | Arizona and Farmers Insurance Exchange |

| | |
|---|---|
| /s/ R. Wardell Loveland | /s/ Lara J. Edelstein |
| R. Wardell Loveland | Lara J. Edelstein |
| SBN 127736 | Florida Bar No. 78591 |
| Coddington, Hicks & Danforth | E-mail: ledels@uaig.net |
| 555 Twin Dolphin Drive, Suite 300 | Paul E. Susz |
| Redwood Shores | Florida Bar No. 836095 |
| Redwood City, CA 94065 | Email: psusz@uaig.net |
| Telephone: (650) 592-5400 | 1313 N.W. 167 Street |
| Facsimile: (650) 592-5027 | Miami Gardens, FL 33169 |
| rloveland@chdlawyers.com | Telephone: (305) 774-6160 |
| | |
| Counsel for Defendant CSAA | House Counsel for |
| Fire & Casualty Insurance Company | United Automobile Insurance Company |

| | |
|---|---|
| /s/ P. Bruce Converse | /s/ Jeffrey S. Cashdan |
| STEPTOE & JOHNSON, LLP | Jeffrey S. Cashdan, admitted pro hac vice |
| Floyd P. Bienstock (Az Bar No. 006299) | Claire C. Oates, admitted pro hac vice |
| P. Bruce Converse (Az Bar No. 005868) | KING & SPALDING LLP |
| 201 E. Washington St, Suite 1600 | 1180 Peachtree Street, NE |
| Phoenix, AZ 85004 | Atlanta, Georgia 30309 |
| Telephone No. 602-257-5200 | Telephone:  (404) 572-4600 |
| Facsimile No. 602-257-5299 | Facsimile:  (404) 472-5139 |
| fbienstock@steptoe.com | jcashdan@kslaw.com |
| bconverse@steptoe.com | coates@kslaw.com |
| | |
| Attorneys for Defendants Metropolitan Property and Casualty Insurance Company, Metropolitan Group Property and Casualty Insurance Company and Metropolitan Casualty Insurance Company | /s/ Michael R. Nelson |
| | Michael R. Nelson, admitted pro hac vice |
| | Kymberly Kochis, admitted pro hac vice |
| | Francis X. Nolan, admitted pro hac vice |
| | Sutherland Asbill & Brennan LLP |
| | 1114 Avenue of the Americas, 40th Floor |
| | New York, NY 10036-7703 |
| | Telephone:  (212) 389-5068 |
| | |
| | michael.nelson@sutherland.com |
| | kymberly.kochis@sutherland.com |
| | frank.nolan@sutherland.com |

Counsel for Defendants
Progressive Preferred Insurance Company,
Progressive Advanced Insurance Company,
and Progressive Casualty Insurance
Company

/s/ Michael E. Mumford
Ernest E. Vargo, Admitted Pro Hac Vice
evargo@bakerlaw.com
Michael E. Mumford, Admitted Pro Hac
Vice
mmumford@bakerlaw.com
BAKERHOSTETLER LLP
PNC Center, Suite 3200
1900 East 9th Street
Cleveland, OH 44114-3482
Telephone (216) 621-0200
Facsimile (216) 696-0740

Counsel for Defendants Liberty Mutual
Insurance Company and Safeco
Insurance Company of America

/s/ Michael H. Carpenter
Michael H. Carpenter
Michael N. Beekhuizen
David J. Barthel
Carpenter Lipps & Leland LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
(614) 365-4100 telephone
(614) 365-9145 facsimile
carpenter@carpenterlipps.com
beekhuizen@carpenterlipps.com
barthel@carpenterlipps.com

Mark J. Botti
Squire Patton Boggs (US) LLP
1200 19th Street, N.W., Suite 300
Washington, District of Columbia  20036
(202) 626-6600 telephone
(202) 626-6780 facsimile
mark.botti@squirepb.com

Attorneys for Defendants Nationwide
Insurance Company of America, Nationwide
Mutual Insurance Company, and Nationwide
Affinity Insurance Company of America

/s/ Kathy J. Maus
KATHY J. MAUS, ESQ.
Florida Bar No.:  0896330
kmaus@butlerpappas.com
JULIUS F. PARKER III, ESQ.
Florida Bar No.: 0160857
jparker@butlerpappas.com
Secondary:

/s/ E.K. Cottrell
E.K. Cottrell (Fla. Bar No: 0013579)
EMAIL: ecottrell@sgrlaw.com
SMITH, GAMBRELL & RUSSELL, LLP
50 N. Laura Street, Suite 2600
Jacksonville, FL  32202
Telephone:   (904) 598-6100
Facsimile:   (904) 598-6300

eservice@butlerpappas.com
BUTLER WEIHMULLER KATZ CRAIG
LLP
3600 Maclay Blvd., Suite 101
Tallahassee, Florida  32312
Telephone:    (850) 894-4111
Facsimile:    (850) 894-4999

Attorneys For:
MERCURY CASUALTY COMPANY

Attorneys for Defendants Sentry Insurance
A Mutual Company

s/ Thomas W. Curvin
Thomas W. Curvin
SUTHERLAND ASBILL & BRENNAN
LLP
999 Peachtree Street, NE, Suite 2300
Atlanta, Georgia  30309-3996
404.853.8314 (T)
404.853.8806 (F)
tom.curvin@sutherland.com

Attorneys for Defendant
Zurich American Insurance Company

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of October, 2015, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which will send a Notice

of Electronic Filing to all counsel of record that are registered with the Court's CM/ECF

system.

/s/ Thomas G. Rohback
Thomas G. Rohback
(*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
Phone: (860) 275-8100
Facsimile: (860) 275-8101
trohback@axinn.com