# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

LEGENDS COLLISION CENTER, LLC, et al.,

      Plaintiffs,

v.                                                      Case No: 6:14-cv-6006-Orl-31TBS

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, et al.,

      Defendants.

_____

## ORDER

This matter comes before the Court on motions to dismiss (Doc. 94, 96, 97) filed by various groups of Defendants, the response in opposition (Doc. 99) to those motions filed by the Plaintiffs, and the replies (Doc. 104-106) filed by the movants.   The portions of those motions having to do with the Plaintiffs' state law claims were referred to Magistrate Judge Smith for disposition by way of a report and recommendation.   On April 29, 2016, Judge Smith entered his Report and Recommendation (Doc. 108).   In it, he recommended that both of the Plaintiffs' claims under Arizona law – tortious interference and unjust enrichment – be dismissed with prejudice.   (Doc. 108 at 21).   The Plaintiffs filed an objection (Doc. 110), but it was stricken as untimely.   (Doc. 117).   The GEICO Defendants filed a partial objection, arguing that, in a footnote, Judge Smith unnecessarily speculated about the status of Arizona law on the topic of tortious interference with business relations.   (Doc. 109 at 2).   As the footnote at issue is admittedly *dicta*, the Court declines to address it in the context of an objection to a Report and Recommendation.

Accordingly, the Report and Recommendation stands without objection.   Having reviewed the Report and Recommendation, the Court is satisfied that there is no clear error on the face of the record.   *See Macort v. Prem, Inc.*, 208 Fed. Appx. 781, 784 (11th Cir. 2006). Accordingly, the Report and Recommendation will be confirmed and adopted and made part of this order.   The remainder of this order will therefore address only the Plaintiffs' federal law claims.

### I.        Background

The instant case is one of 24 similar actions, consolidated for pretrial purposes, in which auto repair shops in a particular state have accused insurance companies of violating Section 1 of the Sherman Antitrust Act and various state laws by conspiring to suppress the amounts they are obligated to pay for automobile repairs.   The lead case among these actions – henceforth, the "Florida Action" – was filed in this court in February 2014.   The initial complaint in that case was dismissed *sua sponte* in June 2014 on the grounds that it was a prohibited "shotgun" pleading, that it failed to properly set forth the basis for the Court's jurisdiction, that it failed to identify which parties had ongoing contracts with one another, and that all of the alleged misdeeds were attributed, collectively, to every Defendant, even where such collective attribution made no sense. (Doc. 110 at 1-2 in Case No. 6:14-cv-310-Orl-31TBS).

The plaintiffs in the Florida Action filed an amended complaint later that same month. (Doc. 167 in Case No. 6:14-cv-310-Orl-31TBS).   Subsequently, various defendants moved to dismiss.   In January 2015, this court granted those motions in part, dismissing all the claims in the Florida Action, some with prejudice.   (Doc. 291 in Case No. 6:14-cv-310-Orl-31TBS).   The Sherman Act claims in that case – one for price-fixing, and one for an illegal boycott – were dismissed because the Florida Action Plaintiffs had failed to adequately plead the existence of an

agreement and had failed to adequately allege a concerted refusal to deal, respectively.   (Doc. 291 at 20-21 in Case No. 6:14-cv-310-Orl-31TBS).   After another amended complaint and another round of motions to dismiss, the Court dismissed the Florida Action with prejudice in September 2015.   (Doc. 341 in Case No. 6:14-cv-310-Orl-31TBS).   In regard to the antitrust claims, the court again found that the plaintiffs had failed to adequately allege the existence of an agreement or a concerted refusal to deal.   (Doc. 341 at 20-21 in Case No. 6:14-cv-310-Orl-31TBS).   The plaintiffs in the Florida Action did not appeal that dismissal.[1]

The instant case was filed in the United States District Court for the District of Arizona in October 2014.   (Doc. 1).   On December 3, 2014, the United States Judicial Panel on Multidistrict Litigation transferred the case to this Court.   (Doc. 61).   Subsequently, two groups of Defendants filed motions to dismiss (Doc. 73, 74).   On June 3, 2015, Magistrate Judge Smith entered a Report and Recommendation (Doc. 83) that all of the claims asserted in the Complaint in this matter be dismissed, some with prejudice.   On August 17 2015, the Court adopted the Report and Recommendation.   (Doc. 91).   The Plaintiffs filed an Amended Complaint (Doc. 93) (henceforth, the "FAC"); in response, the Defendants filed the motions that are the subject of this order.

## II.    Legal Standards

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief" so as to give the defendant fair notice of what the claim is and the grounds upon which it rests, *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957), *overruled on other grounds*, *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544,

---

[1] As of the date of this order, of the 24 actions in these consolidated proceedings, the Florida Action and five others have been dismissed and not appealed or had their appeals dismissed; nine are currently on appeal; one was voluntarily dismissed; one was remanded; one was settled; and six, including this one, remain pending before this court.

127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A Rule 12(b)(6) motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint; it does not decide the merits of the case. *Milbum v. United States*, 734 F.2d 762, 765 (11th Cir.1984). In ruling on a motion to dismiss, the Court must accept the factual allegations as true and construe the complaint in the light most favorable to the plaintiff. *SEC v. ESM Group, Inc.*, 835 F.2d 270, 272 (11th Cir.1988). The Court must also limit its consideration to the pleadings and any exhibits attached thereto. Fed. R. Civ. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).

The plaintiff must provide enough factual allegations to raise a right to relief above the speculative level, *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1966, and to indicate the presence of the required elements, *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1302 (11th Cir. 2007). Conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal. *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court explained that a complaint need not contain detailed factual allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id*. 678, 129 S.Ct. at 1949 (internal citations and quotations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the plaintiff is entitled to relief.'" *Id.* at 679, 129 S.Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

**III.    Analysis**

According to the allegations of the FAC, which are accepted in pertinent part as true for purposes of resolving the instant motions, the Plaintiffs are a group of three Arizona auto body shops and one individual who formerly owned a body shop in that state.   The Defendants are a group of 42 insurers who, collectively, write roughly 90 percent of the private passenger automobile policies in Arizona.   (FAC at 2-15, 17-18).   The Plaintiffs contend that the Defendants have engaged

> in a widespread, concerted and combined course of illegal conduct to depress automobile repair costs and control the automobile repair industry by, among other things: (1) price fixing labor rates; (2) price fixing replacement parts; (3) compelling use of substandard or dangerous replacement parts; (4) compelling use of parts procurement programs or parts sources; (5) boycotting Plaintiffs' businesses; and/or (6) steering customers away from Plaintiffs and similarly situated body shops for refusing to comply with fixed prices, refusing to use substandard or improper parts, or nonperformance of critical processes and procedures.

> Defendant insurers, through their aggregated market share and through agreement with other Defendant insurers, interfere with Plaintiffs' current and prospective business relations by, among other things: (1) intentionally misrepresenting and/or knowingly making false statements regarding the quality, efficiency and ethical reputation of Plaintiffs' businesses and (2) threatening insureds and/or claimants with denial of coverage (or portions of available coverage) if the insured and/or claimant persists in their efforts to patronize Plaintiffs' businesses.

 (FAC at 16).

In a nutshell, the Plaintiffs complain that all of the Defendants pay Arizona repair shops (on behalf of the Defendants' insureds or claimants) essentially the same hourly rates for repairs, painting, and the like.   Those rates, the Plaintiffs allege, are based on market surveys performed by Defendants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (henceforth, collectively, "State Farm").   (FAC at 38).   The Plaintiffs allege that State Farm manipulates or fakes the survey results, producing bogus "market rates" that are

below the rates actually prevailing in the marketplace.   (FAC at 38).   State Farm insists that it is only willing to pay these phony market rates, and the other Defendants insist on paying no more than State Farm pays.   (FAC at 40).

In addition, the Plaintiffs allege that the Defendants have a list of repair procedures for which they all refuse to pay, even when that particular procedure is recommended by the industry's leading repair-estimating databases, (FAC at 45), and that the Defendants insist that the shops use cheaper (and lower-quality) parts when performing repairs, (FAC at 49-50).   Finally, the Plaintiffs contend that when repair shops balk at any of this, such as by trying to raise their hourly rates or utilize higher-quality parts, they are subject to boycotts in the form of having the Defendants' insureds "steered" away from their shops to compliant shops.   (FAC at 53-54).

### A.   Count One – Price Fixing

In Count One, which incorporates all 430 preceding paragraphs of the First Amended Complaint, the Plaintiffs allege that the Defendants have "engaged in unlawful contracts, combinations, and/or conspiracies in restraint of interstate trade and commerce" in violation of Section 1 of the Sherman Act, 15 U.S.C. §1 et seq.   (FAC at 78).   Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."   While § 1 could be interpreted to bar every agreement in restraint of trade, the Supreme Court has long recognized that Congress intended to outlaw only unreasonable restraints.   See, e.g., *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 342-43, 102 S.Ct. 2466, 2472-73, 73 L.Ed.2d 48 (1982) (citing *United States v. Joint Traffic Assn.*, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898)).   Even where a restraint of trade is unreasonable, it is only prohibited if it was effected by a contract, combination or conspiracy.   *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775, 104 S.Ct. 2731,

2743, 81 L.Ed.2d 628 (1984).   Because of this, the "crucial question" in § 1 cases is whether the challenged anticompetitive conduct "stems from independent decision or from an agreement, tacit or express."   *Twombly*, 550 U.S. at 553, 127 S.Ct. at 1964 (alterations and citations omitted).

### Direct Evidence

The Plaintiffs argue that the allegations of the First Amended Complaint include direct evidence of an agreement to fix prices.   (Doc. 99 at 3).   However, the allegations that they primarily attempt to rely on – found at pages 63 and 64 of the First Amended Complaint – have nothing to do with price fixing.   They involve an employee of Progressive Hawaii Insurance Company, which is not a defendant in the instant case.   The Progressive Hawaii employee is purported to have admitted in a separate law suit that his company "made derogatory statements" about body shops that would not go along with its demands and deliberately refused to pay legitimate repair costs when the company was unsuccessful in steering customers to its preferred body shops.   (FAC at 63-64).   These allegations do not aid the Plaintiffs in establishing the existence of an agreement to fix prices.

Similarly, the Plaintiffs focus on allegations by anonymous "representatives" of other Defendants – made at unspecified times and places, to unidentified individuals, with no indication that the speaker was in a position to know the truth of the assertions being made – that State Farm, in essence, manipulates the market price and the other Defendants follow along.   Contrary to the way the Plaintiffs characterize these statements in their response to the instant motion, these anonymous individuals do not allege or demonstrate that any Defendant has entered into an agreement with any other Defendant to fix prices.

The Plaintiffs also attempt to rely on the following list of what they describe as "circumstantial evidence" set forth in the First Amended Complaint in support of their so-called "direct evidence" of price-fixing:

A USAA representative has specifically admitted body shop labor rates paid by USAA alter [sic] based upon receipt of State Farm's "survey" by USAA and conform to same.

Multiple Allstate representatives in multiple states have specifically linked the labor rates paid by Allstate to body shops to the labor rates determined by State Farm.

Multiple Allstate representatives in multiple states have specifically stated the market rate will not change until State Farm says it does.

Multiple GEICO representatives have specifically linked the labor rates paid by GEICO to body shops to the labor rates determined by State Farm.

Multiple GEICO representatives have specifically stated the market rate will not change until State Farm says it does.

All Defendants assert the labor rate they pay constitutes the "market rate".

Representatives or agents of the other Defendants not specifically identified in the Amended Complaint by name have all made statements to Defendants they will only alter their market rate when State Farm does.

None of the Defendants save State Farm perform any review of the market at all and can have no independent knowledge of the market or a market rate.

The "survey" conducted by State Farm does not reflect the labor rates actually charged by body shops, even when a shop is the only shop in town and constitutes the entirety of the market.

The survey conducted by State Farm uses falsified data, specifically but not limited to ordering body shops to lower the labor rates entered into the survey or altering the labor rates entered into the survey by body shops.

The survey conducted by State Farm utilizes a method of analysis which has no mathematical or statistical validity.

The results of State Farm's survey are fabricated and a State Farm
representative has admitted the market rate is fabricated.

State Farm does not publicly share the results of their survey.

The Defendants all pay the same market labor rate which is identical
to the fabricated State Farm market rate.

When State Farm alters its market rate, the remaining Defendants
alter the labor rates they pay to conform to the State Farm rate.

The Defendants routinely compel or attempt to compel use of
salvage or imitation parts which are unsafe or inappropriate.

When Plaintiffs refuse to use unsafe or inappropriate salvage or
imitation parts, the Defendants refuse to pay for appropriate parts
but only pay the amount for which the unsafe or inappropriate part
could have been purchased.

Defendants routinely refuse to pay or pay in full for the same
processes and procedures required to return a vehicle to its pre-
accident condition.

Defendants refuse to pay or pay in full for the same processes and
procedures in contravention of body shop industry labor databases
which the Defendants themselves use, manufacturer recommended
repairs or I-CAR recommendations, even when publicly stating they
do follow such recommendations.

(Doc. 99 at 5-6) (internal citations to the First Amended Complaint omitted).   The Plaintiffs assert

(without further explanation) that these allegations from the First Amended Complaint show the

Defendants "have engaged in a combination or conspiracy to fix labor rates in the body shop

industry by adhering to the fabricated 'market rate' circulated by State Farm and altering the

"market rate" when State Farm does."   (Doc. 99 at 6-7).   Again, however, contrary to the

Plaintiffs' representations, this list of allegations, taken as true, does not establish that the

Defendants have entered into an agreement to fix prices.   At most, they establish that the

Defendants have engaged in conscious parallelism, following State Farm's lead with regard to

labor rates, quality of repair parts, and so on.   As discussed below, conscious parallelism without

more is not a violation of the Sherman Act.

<u>Conscious Parallelism</u>

Plaintiffs without direct evidence may attempt to establish the existence of a price-fixing agreement by relying (in part) on allegations of parallel behavior.   A showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, but it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense.   *Twombly,* 550 U.S. at 553, 127 S.Ct. at 1964 (citations omitted).   Because of this, stating a claim under Section 1 of the Sherman Act requires "a complaint with enough factual matter (taken as true) to suggest that an agreement was made."   Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965.*

The actions allegedly taken by the Defendants in this case, such as paying the same labor rates, refusing to pay for the same list of procedures, and requiring the use of lower-quality parts, are not enough, on their own, to constitute a violation of Section 1 of the Sherman Act.   Evidence of conscious parallelism[2] alone does not permit an inference of conspiracy unless the plaintiff either (1) establishes that, assuming there is no conspiracy, each defendant engaging in the parallel

---

[2]     The Supreme Court has defined conscious parallelism as a "process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions."   *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227, 113 S.Ct. 2578, 2590, 125 L.Ed.2d 168 (1993).   In other words, conscious parallelism is the practice of interdependent pricing in an oligopolistic market by competitor firms that realize that attempts to cut prices usually reduce revenue without increasing any firm's market share, but that simple price leadership in such a market can readily increase all competitors' revenues.

*City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 570 (11th Cir. 1998).

action acted contrary to its economic self-interest[3] or (2) offers other "plus factors" tending to establish that the defendants were not engaging merely in oligopolistic price maintenance or price leadership but rather in a collusive agreement to fix prices or otherwise restrain trade. *Harcros Chemicals,* 158 F.3d at 570-71.

In *Twombly*, the Supreme Court noted a number of "plus factors," identified by commentators (and the parties in that case) that could support a plausible inference of such a collusive agreement, including: "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties;" conduct indicating "restricted freedom of action and sense of obligation that one generally associates with agreement;" or "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Twombly*, 550 U.S. at 556 n.4, 127 S. Ct. at 1965 n. 4 (internal citations omitted).

Thus, in addition to setting out the Defendants' uniform conduct, the Plaintiffs must provide enough factual matter, taken as true, to show that the Defendants took steps that would otherwise have been against their economic self-interest or that tends to show collusion.

> The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief."   A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory.

---

[3]  In their response to the instant motions, the Plaintiffs do not assert that the Defendants acted in a way that would have been contrary to their self-interest in the absence of an agreement.

*Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966.

Plus Factors

The Plaintiffs argue that the First Amended Complaint contains numerous allegations that, taken as true, establish the existence of "plus factors" that when combined with the Defendants' parallel conduct support a plausible conclusion that they entered into a collusive agreement.

The Plaintiffs assert that they have set forth one of the plus factors set out in *Twombly*: conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement.   (Doc. 99 at 15).   In particular, they contend that factual allegations set forth within the First Amended Complaint show that "[m]ultiple defendants (as well as non-defendants) have plainly stated they are restricted from altering the purported "market rate" unless and until authorized by State Farm."   (Doc. 99 at 15).   However, the material cited in the Plaintiffs' response – found at pages 43 to 45 of the First Amended Complaint – does not support this assertion.   The cited passages have to do with the Defendants' alleged misuse of repair-estimating databases; they do not contain any assertions about restrictions on altering the purported market rate (or anything else) without State Farm's approval.

The Plaintiffs also attempt to rely on several items *not* set out in *Twombly*.   Relying on a case from the Sixth Circuit, *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999), the Plaintiffs assert that (1) uniformity of action, (2) a common motive to conspire, and (3) exchange of information relative to the conspiracy (or opportunity to do so) are all plus factors that when combined with parallel behavior would support a plausible conclusion that the Defendants had entered into a price-fixing agreement.   But while the *Re/Max* case (which predates *Twombly*) discusses these topics, it does not hold that "uniformity of action" or any of the other items, when combined with price-fixing, is enough to establish the existence of an agreement in a price-fixing

case.   And this is also true here.   What the Plaintiffs describe as "uniformity of action" amongst these Defendants, such as their assertions that the Defendants have adhered to the State Farm-created "market rate" (Doc. 99 at 15), are simply a relabeling of the alleged parallel conduct, rather than a "plus factor" to it.   And while a common motive to fix prices and the ability to share price information are both likely prerequisites to a price-fixing conspiracy, the existence of either (or both) is not enough to tip the scales from parallel behavior to collusion.   To conclude otherwise would mean that essentially every allegation of price-fixing would survive a motion to dismiss.   The only allegations that would fall short would be bizarre scenarios where (1) the alleged conspirators could not possibly benefit from an agreement to fix prices or (2) the alleged conspirators could not possibly share information about prices.

In light of the foregoing, the Court finds that the Plaintiffs have again failed to assert sufficient factual matter to suggest that an agreement was made.   Therefore, they have again failed to state a claim for price-fixing in violation of Section 1 of the Sherman Act.

## B.        Count Two – Boycott

In Count Two, which realleges all of the allegations of the preceding 81 pages of the First Amended Complaint, the Plaintiffs assert that the Defendants have attempted to coerce auto repair shops into going along with their price-fixing scheme by, *inter alia,*

> steering actual and potential customers away from Plaintiffs through knowing dissemination of false and misleading statements about Plaintiffs; manipulating delays and obstacles in approving, obtaining and paying for repairs obtained from Plaintiffs; economically coercive threats that use of Plaintiffs' services will incur additional and greater out-of-pocket costs to customers; alteration and manipulation of the Defendant insurers' referral and rating systems to limit or otherwise influence customer access to service providers.

(FAC at 82).

The generic concept of "boycott" refers to a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target. *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978).   Among other things, the Defendants argue that the boycott claim must be dismissed because the Plaintiffs have again failed to allege conduct that would constitute a concerted refusal to deal – the same reason their previous boycott claim was dismissed.   (Doc. 96 at 19.)

The Plaintiffs argue that they have set forth in the First Amended Complaint allegations of both direct and indirect boycotting of the Plaintiffs.   As examples, they point to allegations as to the Defendants

> Making false and misleading statements about the quality of Plaintiffs' work including but not limited to false statements that a defendant insurer has received complaints about Plaintiffs shops, that Plaintiffs are known to overcharge, that Plaintiffs take too long to complete repairs and that if a consumer has a Plaintiff perform repairs the Defendant insurer will not warrant the work;
>
> Making the false statement that a consumer is required to go to a preferred shop for an estimate before being allowed to go to the shop of choice for repairs; [and]
>
> Economically coercing consumers away from Plaintiffs shops by withholding or delaying access to rental vehicles, threatening to withhold full payment of repairs, and telling consumers repairs at a Plaintiffs shop will take too long and the customer will run out of rental coverage and will have to pay any rental charges the Defendant insurer chooses not to pay.

(Doc. 99 at 23) (internal citations to the First Amended Complaint omitted).

Even accepting these vague allegations as true, they are not enough to support a boycott claim.   First, these allegations are not tied to any of the behavior that the Defendants are supposedly attempting to discourage.   The Plaintiffs do not allege, for example, that one or more of them refused to accept State Farm's market rate and, in response, the Defendants began badmouthing the noncompliant shop.   More importantly, there are no allegations that the

Defendants have engaged in a concerted refusal to deal with any of the Plaintiffs' shops, ever.   To the contrary, the First Amended Complaint is replete with assertions that the Plaintiffs are continuing to repair vehicles owned by the Defendants' insureds and, indeed, could not survive financially if they did not do so.   Accordingly, the Plaintiffs have again failed to state a claim for boycott under Section 1 of the Sherman Act.

**IV.     Conclusion**

The Plaintiffs have had multiple attempts to state an antitrust claim. Based upon a review of the pleadings in this and the other 20-odd consolidated cases – the vast majority of which share the same shortcomings – the Court finds that giving the Plaintiffs another opportunity to state a claim would be an exercise in futility.   Accordingly, both antitrust claims will be dismissed with prejudice.   In consideration of the foregoing, it is hereby

**ORDERED** that the motions to dismiss (Doc. 94, 96, 97) are **GRANTED** as to the antitrust claims as set forth above, and Counts One and Two are **DISMISSED WITH PREJUDICE.**   And it is further

**ORDERED** that the Report and Recommendation of Judge Smith (Doc. 108) is **ADOPTED AND CONFIRMED** and made a part of this order.   The Plaintiffs' state law claims are also **DISMISSED WITH PREJUDICE.**

The Clerk is directed to close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on December 22, 2016.


Copies furnished to:

Counsel of Record
Unrepresented Party